**James A. RED DOG, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Sept. 29, 1992.
Decided: Nov. 5, 1992.

Edward C. Pankowski, Jr. (argued), and John H. McDonald, Asst. Public Defenders, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., Timothy J. Donovan, Jr., Steven P. Wood and Peggy J. Hageman, Deputy Attys. Gen., Wilmington, for appellee.

Before VEASEY, Chief Justice, HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court en Banc.

HOLLAND, Justice:

James Allen Red Dog ("Red Dog"), the defendant-appellant, was convicted of Murder in the First Degree. Following a penalty hearing, the Superior Court sentenced Red Dog to death by lethal injection.[1] Red

---

1. On April 20, 1992, this Court entered an order staying the execution of the sentence of death imposed by the Superior Court. That order provides that the stay of execution shall remain

Dog personally sought such a sentence.[2] Red Dog's attorneys, pursuant to his instructions, did not file a direct appeal.

An automatic appeal was docketed with this Court, 11 *Del.C.* § 4209(g) and Supr. Ct.R. 35. Red Dog's attorneys have represented him during the briefing and oral argument in this mandatory proceeding.[3] This Court has conducted the review which is proscribed by Delaware's death penalty statute. We have concluded that the Superior Court's decision, sentencing Red Dog to death, should be affirmed.

## EVIDENCE OF GUILT

Red Dog was charged in a nine-count indictment returned by a grand jury in February of 1991. Two of those counts, Murder in the First Degree and Possession of a Deadly Weapon During the Commission of a Felony, were related to the death of Hugh Pennington. The indictment also charged Red Dog with four counts of Unlawful Sexual Intercourse in the First Degree, one count of Kidnapping in the First Degree, and two counts of Possession of a Deadly Weapon During the Commission of a Felony. Those charges were related to conduct involving Hugh Pennington's mother, Ailsa Pennington. Red Dog entered *nolo contendere* pleas to all nine charges on March 12, 1992.

The Superior Court record has been filed with this Court. The count of the indictment which charged Red Dog with Murder in the First Degree alleged that he had intentionally caused the death of Hugh Pennington. The facts regarding that crime were related to the Superior Court by the State. Those facts were initially presented in the recitation of the evidence which the State would have introduced at a trial, following the entry of Red Dog's pleas of *nolo contendere.*

Hugh Pennington, the murder victim, was thirty years old at the time of his death. He worked at the Tally Ho Motor Lodge as a night auditor. He lived with his mother, Ailsa Pennington, in a house in New Castle County.

On the evening of February 9, 1991, Ailsa Pennington and Bonnie Red Dog, Red Dog's wife, were together at the Pennington residence. The two women had been friends for about six years. They had agreed to spend that evening together because Bonnie Red Dog's husband was in Sussex County for the day.

Hugh Pennington arrived home at about 9:00 p.m. on the evening of February 9, 1991. His mother and Bonnie Red Dog were watching a rented movie. Because of his job, it was his custom to go to bed early. On nights when Hugh Pennington was not working, he would often get up later to watch television.

On the evening of February 9, 1991, Hugh Pennington went to bed shortly after he arrived home. At about 9:30 p.m., Ailsa Pennington and Bonnie Red Dog went to the Red Dog residence, an apartment in Bellefonte. The door to the Pennington residence was left unlocked.

Red Dog arrived at the Pennington home some time after Ailsa Pennington and his wife had departed. The evidence in the record reflects that Hugh Pennington was accosted by Red Dog in the kitchen. Hugh Pennington was then forced into his basement workshop. There, Red Dog bound Hugh Pennington's hands and feet with duct tape and electrical cord.[4] Red Dog then cut Hugh Pennington's throat repeatedly with a knife, nearly decapitating him.

---

in effect "until the completion of the judicial review of the automatic appeal taken in this case."

**2.** The Superior Court specifically noted that its sentencing decision was not based upon Red Dog's request to have the death penalty imposed.

**3.** At oral argument, Red Dog's attorneys read a letter from him to this Court expressing his

desire to be executed. Red Dog's personal position was not considered in this automatic appeal.

**4.** According to the medical examiner, a blister discovered on Hugh Pennington's thumb may have been caused by his struggling against his bonds before his death.

After murdering Hugh Pennington, Red Dog arrived at his own home shortly after midnight. He entered his residence holding a whiskey bottle. Bonnie Red Dog and Ailsa Pennington were in the living room.

Red Dog stated that he needed to help a friend tow his van out of a ditch. The location that Red Dog gave for the van was near the Pennington home. Ailsa Pennington was asked to give him a ride. She agreed to do that. When Red Dog left his residence, he picked up a coil of new clothesline, purportedly to use as a tow rope.

As they were riding, Red Dog told Ailsa Pennington that the story about the van in the ditch was untrue. He told her that he really wanted to see her son about obtaining some lithium, a medication taken by Hugh Pennington to control depression. When Ailsa Pennington told him that her son was sleeping, Red Dog replied that Hugh was awake and watching television. From those remarks, she inferred that Red Dog had already been to her home that night and had spoken with her son.

Ailsa Pennington drove to her residence with Red Dog. When they arrived, the house was quiet. The lights were off in the den. She assumed that Hugh had gone back to bed. She asked Red Dog to talk to him another time.

Red Dog then told Ailsa Pennington that her son had been tied up and was in the basement.[5] He also told her that her son was in danger from some men who would be coming to her home that night. Red Dog took Ailsa Pennington into the master bedroom at knifepoint. He tied her to her bed with the clothesline and raped her. Ailsa Pennington remained tied to the bed throughout the night and was subjected to subsequent sexual assaults by Red Dog.

In the morning, Red Dog directed Ailsa Pennington to call her employer and state that she would not be coming to work that day. Noticing a strange tone of voice, her employer asked Ailsa if she wanted the police. Ailsa replied affirmatively. Her employer called the police.

Immediately after the telephone call with her employer was completed, Red Dog, armed with the knife, forced Ailsa Pennington to leave her home. Ailsa purposely left her pocketbook on the kitchen table. When the police arrived, Ailsa Pennington and Red Dog were gone.

Red Dog forced Ailsa Pennington to get into her car. He drove her to a farmhouse in rural Sussex County. There, he sexually assaulted her again. While in the farmhouse, Red Dog wrote a note to his wife which began: "I went crazy last night and killed Hugh."

Red Dog left the farmhouse with Ailsa Pennington at dusk. He took a loaded rifle from the farmhouse with him. He ordered her to drive him to a friend's residence near Millsboro, Delaware. When they arrived, Red Dog went inside to use the telephone. He left Ailsa Pennington, the knife and the rifle in the car.

When Red Dog was inside the residence, Ailsa Pennington drove away. Upon seeing her leave, Red Dog said words to the effect of, "Oh my God, she knows." When his friend asked, "Knows what?" he replied, "She knows what happened. I killed somebody." He then asked his friend for directions and ran out of the back door.[6]

Ailsa Pennington stopped at the first lighted establishment she encountered. The police were called. Ailsa Pennington was flown to the Christiana Medical Center and examined for sexual assault. She subsequently gave a detailed statement to the police.

When the police arrived at the Pennington residence earlier on February 10, 1991, in response to Ailsa's employer's telephone call, they found Hugh Pennington's body in the basement workshop. The police recovered many items of physical evidence from the Pennington premises. Hugh Penning-

5. Red Dog gave Ailsa Pennington varying accounts of Hugh Pennington's whereabouts and physical condition during the course of her ordeal. However, Red Dog consistently led her to

believe that her son was alive and that only Red Dog could secure his safe release.

6. Red Dog was apprehended in Wilmington four days after Ailsa Pennington's escape.

ton's bloody pajama top was found, with two buttons missing, in his mother's bedroom closet. The buttons were recovered in the kitchen. A pair of blood-soaked socks were found in the washing machine. Bloody footprints were discovered on a rug and on the basement steps. Heritage cigarettes and butts were found in the master bedroom.[7] In the master bedroom, the police also found lengths of rope tied to the bed and a coil of rope under the bed. Several long strands of human hair were found on the bed in the master bedroom and on the floor of Hugh Pennington's bedroom. In the basement, the police found a used roll of duct tape with a bloody fingerprint on the inside. Latex gloves and a piece of paper labeled "guest check", with directions to Baltimore, were also discovered in the basement.

The bloody fingerprint on the roll of duct tape was positively identified as Red Dog's. Latent fingerprints found in the kitchen were also identified as Red Dog's. It was determined that the human hair recovered from the bedrooms in the Pennington residence was microscopically consistent with hair from Red Dog's head. According to an FBI footprint expert, several of the bloody footprints left at the Pennington residence matched the characteristics of Red Dog's feet. Heritage cigarettes and latex gloves were found in Red Dog's home. The police ascertained that the "guest check" had been given to Red Dog earlier in the day of February 9, 1991.

Following the foregoing proffer of evidence by the State, the Superior Court concluded that there was a factual basis for each of Red Dog's pleas of *nolo contendere*. The Superior Court stated that, based upon the State's recitation of evidence, it was convinced that a jury would have found Red Dog guilty, beyond a reasonable doubt, as to every count of the indictment. Therefore, the Superior Court accepted all of Red Dog's pleas of *nolo contendere*. It entered a judgment of guilty with regard to the charge of Murder in the First Degree and each of the other eight counts in the indictment.

7. Neither Ailsa nor Hugh Pennington smoked.

## DEATH PENALTY HEARING EVIDENCE

After Red Dog's conviction of Murder in the First Degree on March 12, 1992, a hearing was scheduled to determine the appropriate sentence to be imposed. Red Dog waived his right to have that penalty hearing before a jury. The penalty hearing commenced on March 30, 1992 and ended on April 15, 1992.

Prior to the penalty hearing, Red Dog's attorneys were notified that the State intended to rely upon two separate incidents, a robbery and a double murder, to establish the existence of the following statutory aggravating circumstance:

> The defendant was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person. 11 *Del.C.* § 4209(e)(1)(i).

His attorneys were also advised of the nonstatutory aggravating circumstances which the State contended were applicable. Similarly, Red Dog's attorneys notified the State, prior to the penalty hearing, of the mitigating circumstances that they would present for consideration by the Superior Court.

### Statutory Aggravating Evidence

Evidence presented by the State during the penalty hearing established that Red Dog was convicted in December, 1973, in the United States District Court for the District of Montana of robbery "by force and violence." 18 U.S.C. § 2111. That conviction resulted from an incident which occurred on October 4, 1973. Red Dog and an accomplice, Steven Lilly ("Lilly"), robbed a pizza parlor in Wolf Point, Montana. The proprietor, William Veseth ("Veseth"), was shot and killed. The planned purpose of the robbery was to obtain beer. During the robbery, both Red Dog and Lilly were armed with rifles. At his own trial, Red Dog testified that Lilly, who had previously been convicted of Murder in the First Degree at a separate trial,

fired the fatal shot. Red Dog was convicted of robbery, but acquitted of murder.

The State also established that on April 10, 1978, Red Dog pled guilty in the California Superior Court for Los Angeles County to two counts of Murder in the Second Degree. The evidence presented by the State at the penalty hearing indicated that Red Dog and a companion, Raymond Tapaha ("Tapaha"), were in Los Angeles on the night of August 9–10, 1977. Four days earlier, Red Dog and Tapaha had escaped from prison, where Red Dog had been serving his sentence for the 1973 Wolf Point robbery. While at a bar, Red Dog and Tapaha made the acquaintance of Stanley Large ("Large"). Large invited them to spend the night in his apartment. When Red Dog and Tapaha arrived at Large's apartment, Levi Aragon ("Aragon") and Moses John ("John") were already there. During the night, Red Dog and Tapaha bound Large and John and stabbed them both to death. Tapaha sodomized Aragon at the apartment. Red Dog and Tapaha then kidnapped Aragon, whom Tapaha continued to sodomize repeatedly in Red Dog's presence, until Aragon escaped.

*Non–Statutory Aggravating Evidence*

The State presented evidence that in 1983, while incarcerated in the federal maximum security penitentiary at Marion, Illinois, Red Dog participated in the murder of Joseph Ortega ("Ortega"). Ortega and Red Dog were associated with a prison gang. Ortega had apparently offended other gang members. Red Dog suggested that Ortega be given a lethal dose of heroin. Red Dog obtained the heroin through a prison visitor. Following Ortega's death, Red Dog provided information about the murder to federal authorities and, in exchange, was not prosecuted for his role in that crime.

The State also presented evidence of other criminal activity by Red Dog while he was incarcerated. While at Lompoc Federal Correctional Institution in California, Red Dog was found to be in possession of a homemade knife. Further disciplinary problems resulted in his transfer to the United States Penitentiary at Leavenworth in Kansas. While at Leavenworth, Red Dog apparently smuggled drugs into the prison. Red Dog was then transferred to the maximum security facility at Marion, Illinois, where he became involved with prison gangs, extortion, gambling, drugs, weapons manufacturing and the murder of Ortega.

The State presented evidence that, after Red Dog had been released from prison on parole, he was arrested and convicted in 1986 for Possession of a Firearm in Wolf Point, Montana. The State's evidence reflected that Red Dog was approached by a store clerk, who suspected that he was shoplifting. Red Dog opened his jacket to display a handgun, made a threatening remark to the clerk, and left the store. The clerk informed the police, who located Red Dog sitting behind the wheel of a parked car. When an officer asked Red Dog to step from the car, Red Dog reached for the concealed handgun. Red Dog was arrested and the handgun seized. The handgun was loaded and the safety was off. Red Dog pled guilty to Possession of a Firearm in United States District Court and was sentenced to two years in prison.

The State also presented evidence at the penalty hearing relating to Red Dog's military record. It reflected that he had enlisted in the Marine Corps for a four year term. However, Red Dog was given an undesirable discharge after eighteen months, because he had been absent without leave for approximately eight of those months.

The State established that Red Dog was on parole at the time of Hugh Pennington's murder. Red Dog had been released from prison on June 27, 1990.[8] Less than eight months later he murdered Hugh Pennington.

During the penalty hearing, the State presented comprehensive evidence of the circumstances and details surrounding the

---

8. At the time of his release on parole, Red Dog had approximately four years remaining to be served on the sentence for which he had been incarcerated.

murder of Hugh Pennington. That evidence was introduced by testimony from police officers who investigated the crime, scientific experts, lay witnesses and the testimony of Ailsa Pennington. The State's prior offer of proof was corroborated in every respect.

The State also presented evidence about Red Dog's appearance at a bowling alley in Millsboro earlier on the evening of February 9, 1991. While there, he described himself to a woman as a "terminator" and an "enforcer." When the woman asked what he meant, he replied, "I hurt people."

The State presented evidence from Hugh Pennington's sister regarding the emotional trauma that his death had caused her. She testified that she misses her brother and has trouble sleeping. She has received professional counseling to help her cope with her brother's death.

### Mitigating Evidence

Red Dog's attorneys presented evidence in mitigation at the penalty hearing. First, they presented evidence that Red Dog was intoxicated when he murdered Hugh Pennington. Second, they presented evidence that Red Dog has a history of alcoholism and drug abuse. Third, they presented evidence that Red Dog has mental problems.

First, during the penalty hearing, Red Dog's attorneys called several witnesses who testified that Red Dog had been drinking for most of the day prior to the murder of Hugh Pennington. The exact quantity of alcohol he had consumed was unclear, but the Superior Court accepted the fact that it was a substantial amount.[9] The Superior Court also heard, and accepted as factual, testimony that Red Dog had ingested cocaine while at the Millsboro bowling alley early in the evening of February 9, 1991.

In rebuttal, the State introduced evidence that Odette Wright conversed with Red Dog at the bowling lanes in Millsboro around 8 p.m. on the evening of February 9, 1991. She testified that, although Red Dog had been drinking, she noticed no wobbling in his walk or slurring in his speech. In her view, Red Dog was sober enough to drive safely. The State then presented evidence to show that Red Dog did drive his pickup truck from Millsboro to the Pennington's house in Wilmington.

Second, Red Dog's attorneys presented evidence, during the penalty hearing, relating to Red Dog's history of alcohol and drug dependence. That evidence established that alcohol and/or drugs were involved not only in the murder of Hugh Pennington, but also in the robbery of Veseth in 1973, the murders of Large and John in 1977, and Red Dog's arrest for possessing a firearm in 1986. Evidence was also presented to establish that Red Dog consumed alcohol during his various periods of incarceration.[10] A January 20, 1991 discharge summary from the Bowling Green Treatment Center was also introduced as evidence. According to that document, Red Dog suffers from alcohol and cocaine dependence.

Third, evidence was presented to the Superior Court regarding Red Dog's mental problems. The Superior Court heard, but ultimately rejected, evidence from a defense witness, Dr. Fred Lahvis ("Dr. Lahvis"), who testified that Red Dog suffered from an organic brain disorder caused by repeated head injuries Red Dog claimed he had suffered throughout his life.

Red Dog was evaluated on April 30, 1991, by Dr. Kutas Tavlan–Dogan, a forensic psychiatrist employed by the Delaware State Hospital. Her diagnosis was sub-

---

**9.** The Superior Court noted that such a factor has been recognized as constituting a mitigating circumstance. *See Fead v. State*, Fla.Supr., 512 So.2d 176 (1987); *Norris v. State*, Fla.Supr., 429 So.2d 688 (1983). ·

**10.** On July 20, 1974, while confined at the Lompoc Correctional Institution, Red Dog was in a fight with another inmate. In the words of the investigator, Red Dog was "definitely under the influence of something." When questioned as to what, he stated "he had been drinking rubbing alcohol all day to the amount of 3 pitchers full." On April 10, 1975, again at Lompoc, Red Dog was found in possession of a pitcher full of what appeared to be home brew. On June 25, 1979, Red Dog was again written up for using intoxicants, while confined at the United States Penitentiary in Leavenworth, Kansas.

stance abuse and dependence and personality disorder with narcissistic and antisocial traits.[11] She found no evidence of organic brain damage or impairment of cognitive functioning. Red Dog was seen again on August 29, 1991 at the Delaware State Hospital by staff psychologist S.M. Iqbal. Tests administered by Dr. Iqbal showed Red Dog to be in the upper range of average intelligence with the ability to read at a college level. There was no evidence of mental problems at that time.

### Death Sentence Imposed

Following the penalty hearing, the Superior Court announced its sentencing decision. It concluded that the aggravating circumstances "clearly outweigh[ed]" the mitigating circumstances. The Superior Court sentenced Red Dog to death by lethal injection.

### EX POST FACTO CHALLENGE

■ A preliminary contention raised by Red Dog's attorneys in this automatic appeal is a renewed argument that an application of the 1991 revised death penalty statute to this case violated the *ex post facto* clause of the United States Constitution. This Court has previously considered and rejected that same claim on behalf of Red Dog. *State v. Cohen*, 604 A.2d 846, 852–55 (1992). We have decided to adhere to our prior determination. *Id.*

The General Assembly amended the Delaware death penalty statute in the Fall of 1991. By its terms, the revised statute was applicable "to all defendants tried or sentenced after its effective date." 68 *Del. Laws* ch. 189, § 6. At the time the death penalty statute was amended, Red Dog's trial for capital murder was pending.

Red Dog and six other defendants, who were also awaiting trial, raised several constitutional challenges to the revised death penalty statute in the Superior Court. In response to those challenges, the Superior Court certified ten questions of law to this Court in each case, pursuant to Delaware Constitution Article IV, Section 11(9) and

Supreme Court Rule 41. The various certifications, including Red Dog's case, were consolidated by this Court into a single proceeding. *State v. Cohen*, 604 A.2d 846 (1992). Red Dog's attorneys participated in that matter on his behalf.

In the consolidated certification proceeding, this Court held that "the new law [is] valid in all respects and fully applicable to all the defendants." *Id.* at 848. One of the questions certified to this Court was:

> Is the application of the new law to all defendants tried or sentenced after its effective date violative of the *Ex Post Facto* Clause of Article I, Section 10 of the United States Constitution or any other provision of the United States Constitution?

*Id.* This Court answered that question in the negative. *Id.* at 852–55. Thus, this Court has specifically rejected the contention that the application of the 1991 revisions in the death penalty statute to defendants, such as Red Dog, who committed their crimes prior to the revision of that law, violated the *ex post facto* clause of Article I, Section 10 of the United States constitution. *Id.*

In this appeal, Red Dog's attorneys ask this Court to reexamine its prior answer to the *ex post facto* question on the basis that, following the imposition of the death sentence, Red Dog's case presents a "concrete example as opposed to the theoretical situation presented by the certified questions." This Court previously accepted certification from the Superior Court of the questions raised in Red Dog's case "to resolve important issues regarding the construction and the constitutionality of the new [death penalty statute]." *State v. Cohen*, 604 A.2d at 849. The very purpose of a certification proceeding is to have such issues "settled" by this Court. Supr.Ct.R. 41(b)(iii).

■ The unanimous *en banc* opinion of this Court, answering the questions of law certified to it by the Superior Court while Red Dog was awaiting trial, constitutes the law of the case in the matter *sub judice.*

---

11. Dr. Alan M. Seltzer, a Board Certified psychiatrist, in his January 16, 1991 HMO Progress Report made a diagnosis of, *inter alia,* Antisocial Personality Disorder.

As the law of the case, this Court's prior rulings "must stand *unless* those rulings were *clearly in error* or there has been an important change in circumstance." *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1093 (1987) (emphasis in original). *Accord Hughes v. State*, Del.Supr., 490 A.2d 1034, 1048 (1985). Red Dog has cited no intervening changes in the law or circumstance since the questions certified in his case were answered by this Court.[12]

The present arguments made on behalf of Red Dog, with respect to the *ex post facto* challenge, are identical to those which were made in the certification proceeding. *State v. Cohen*, 604 A.2d at 852–855. We remain convinced that this Court's rejection of identical *ex post facto* challenges, to the applicability of the revised death penalty statute in Red Dog's case, was correct. *Id.* Therefore, we conclude that Red Dog's renewed *ex post facto* argument is without merit. *Id.*

### DEATH PENALTY REVIEW

■ The Delaware capital punishment statute mandates this Court's automatic review of the death sentence that was imposed upon Red Dog by the Superior Court. *See Pennell v. State*, Del.Supr., 604 A.2d 1368, 1375 (1992); 11 *Del.C.* § 4209(g). Although the review which the statute mandates by this Court is limited, that review is not perfunctory. *Pennell v. State*, 604 A.2d at 1375. *See Dobbert v. Florida*, 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). 11 *Del.C.* § 4209(g)(2) provides as follows:

> (2) The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

In performing its mandatory statutory review, this Court is always cognizant that "death as a punishment is unique in its severity and irrevocability." *Pennell v. State*, 604 A.2d at 1375 (citing *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

■ This Court has traditionally commenced its mandatory statutory review by initially addressing subparagraph (b) of Section 4209(g)(2). *Pennell v. State*, 604 A.2d at 1375. That subsection requires this Court to examine the evidence in the record to determine whether it supports the findings of the Superior Court judge which relate to the establishment of statutory aggravating circumstances. 11 *Del.C.* § 4209(e). Thereafter, two additional inquiries are required by subparagraph (a) of Section 4209(g)(2): first, whether the Superior Court judge's imposition of the death penalty was either arbitrary or capricious; and second, whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under the statute. *Pennell v. State*, 604 A.2d at 1375; *Riley v. State*, Del.Supr., 496 A.2d

---

12. The 1991 revision to the Delaware death penalty statute primarily changed the role of the jury during the sentencing process. *State v. Cohen*, Del.Supr., 604 A.2d 846 (1992). Red Dog's attorneys assert that he waived his right to a penalty hearing before a jury "based, in part, on the legal application of the new statute to his case in which the judge was going to ultimately decide his fate." The record does not support that assertion. The record reflects that, with the advice of counsel, Red Dog signed a written waiver which stated: "The defendant voluntarily chooses a judge to decide the penalty phase and not a jury, and no threats or promises have been brought to bear against him in exchange for this decision, made voluntarily and upon sufficient reflection." The record also reflects that Red Dog personally requested a death sentence and waived his right to a jury in order to "expedite" the case "for the family members concerned."

997, 1026 (1985). "Each question requires a consideration of the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender." 11 *Del.C.* § 4209(g)(2); *Pennell v. State,* 604 A.2d at 1375.

### Statutory Aggravating Circumstances

■ At the penalty hearing in this case, the State relied upon the following statutory aggravating circumstance: "The defendant was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person." 11 *Del.C.* § 4209(e)(1)(i). *See DeShields v. State,* Del.Supr., 534 A.2d 630, 648 (1987). At the penalty hearing, the State presented evidence that Red Dog had previously been convicted of armed robbery in Montana. The State also presented evidence that Red Dog had been separately convicted of two counts of second degree murder in California. The State's proof consisted of testimony by eyewitnesses to those crimes, by police officers who investigated the crimes, certified copies of court records, and statements made by Red Dog admitting his guilt.

The Superior Court found that the State had conclusively established the following proof which independently qualified as a statutory aggravating circumstance pursuant to 11 *Del.C.* § 4209(e)(1)(i): first, that Red Dog had been convicted of robbery, a felony, involving the use of force or violence upon another person in Wolf Point, Montana on October 4, 1973; second, that Red Dog had been convicted of two counts of murder in Cudahy, California on August 10, 1977. The Superior Court found that the State had sustained its burden of proving, beyond a reasonable doubt, at least one statutory aggravating circumstance. This Court concludes that the record supports the Superior Court's finding that the State had established, beyond a reasonable doubt, the existence of at least one statutory aggravating circumstance. 11 *Del.C.* § 4209(e), (g)(2)(b).

### Non-statutory Aggravating Circumstances

■ The Superior Court found that the State had also established substantial and reliable evidence with respect to numerous non-statutory aggravating circumstances which were relevant to the commission of the offense, and Red Dog's character and propensities. The consideration of that evidence was carefully recounted by the Superior Court in a thirty-six page written opinion. The Superior Court read that opinion when it announced its sentencing decision.

The Superior Court initially considered the circumstances and details of the death of Hugh Pennington. It found that the murder of Hugh Pennington was "senseless, cold, deliberate, and wholly conscienceless." According to the Superior Court, "this grisly execution-style murder was chillingly callous and cold blooded." The Superior Court characterized the murder of Hugh Pennington and the subsequent crimes against Ailsa Pennington as indicative of a "propensity for violence on the part of [Red Dog which] was but the latest chapter in a series of incidents marked by a senseless indifference to human life."

The Superior Court concluded that evidence relating to the details of any prior felony conviction involving the use or threat of violence was relevant to Red Dog's character and propensities. We agree. *Rhodes v. State,* Fla.Supr., 547 So.2d 1201 (1989). Accordingly, Superior Court considered, *inter alia,* the particular circumstances of the 1973 robbery and murder of William Veseth in Wolf Point, Montana.

The Superior Court also considered the events after Lilly's conviction for William Veseth's murder was reversed on appeal. *United States v. Lilly,* 512 F.2d 1259 (9th Cir.1975). After being acquitted of Veseth's murder, Red Dog testified at Lilly's retrial that he, Red Dog, was responsible for shooting Veseth and that he, Red Dog, had previously lied under oath. The jury at Lilly's retrial acquitted Lilly of Veseth's

murder. Red Dog subsequently pled guilty to Making a False Material Declaration.

The Superior Court considered the circumstances relating to the murders of Large and John in Cudahy, California in 1977, as well as the kidnapping and sodomy of Aragon. The murders of Large and John were wholly unprovoked. Both of those victims were tied and bound before being stabbed to death. Following the murders of Large and John, Red Dog and Tapaha forced Aragon to accompany them in an automobile. While Red Dog was driving, Tapaha sexually assaulted Aragon repeatedly. The Superior Court noted that many details of these crimes were repeated by Red Dog thirteen years later: in the binding of Hugh Pennington before killing him, the use of a knife as the implement of death, and the kidnapping and repeated sexual assaults of Ailsa Pennington.

The Superior Court also considered the circumstances of the 1983 murder of Ortega in Marion, Illinois. While Red Dog was incarcerated at the Marion Federal Penitentiary for the deaths of John and Large, Red Dog was involved in the death of another inmate, Ortega, who died from an overdose of heroin. The Superior Court concluded that although Red Dog "played no direct role in Ortega's death, he did provide the means [heroin] by which the murder was carried out."

The Superior Court considered the circumstances relating to Red Dog's 1986 conviction for Possession of a Firearm. After Red Dog threatened a store clerk, a concealed and loaded semi-automatic handgun was taken from Red Dog by a police officer. Red Dog was on parole at the time.

The Superior Court considered Red Dog's involvement in illegal activities while he had been incarcerated. After reviewing those activities, the Superior Court concluded that "the evidence supports a finding that [Red Dog] was the antithesis of the model prisoner with a bent for rehabilitation. Prison walls have not suppressed his criminal inclinations."

The Superior Court considered Red Dog's record of military service. Red Dog's military record reflected that on or about August 17, 1973, he received an undesirable discharge from the United States Marine Corps. Approximately six weeks later, William Veseth was robbed and murdered.

The Superior Court considered Red Dog's history of criminal convictions. That record spanned two decades, most of Red Dog's adult life. The Superior Court concluded that it demonstrated Red Dog was incorrigible and a "dangerous threat to civilized society."

The Superior Court considered the impact of Hugh Pennington's murder upon his sister as a "victim" of that crime. The Superior Court considered that testimony to be a non-statutory aggravating factor. The Superior Court specifically stated, however, that placing the evidence in its proper perspective, it would "not give undue weight to such testimony."

The Superior Court considered the fact that Red Dog was on parole when Hugh Pennington was murdered. Red Dog had been paroled with about four years of his contemplated incarceration remaining to be served. He had been on parole for less than eight months when he killed Hugh Pennington.

### Mitigating Circumstances

■ The Superior Court carefully considered mitigating evidence presented by Red Dog's attorneys for the purpose of determining the appropriateness of a life or death sentence. The Superior Court found that there was reliable evidence to support several mitigating circumstances which were relevant to the details of the offense and to the character and propensities of Red Dog. Those considerations were included in the written opinion which it read in announcing its sentencing decision.

First, the Superior Court considered the fact that Red Dog was intoxicated prior to and at the time of Hugh Pennington's murder. It noted that although Red Dog had been drinking on the day of the murder, he successfully drove his truck from Millsboro to Wilmington before he killed Hugh Pennington and then drove home. The Superi-

or Court concluded that while Red Dog was under the influence of alcohol and/or drugs on the evening of the homicide, Red Dog was not intoxicated to the point of being unable to exercise control over his mental faculties. Nevertheless, it decided to "view Red Dog's being under the influence of alcohol and/or drugs on the night of the homicide as a mitigating circumstance."[13]

Second, the Superior Court considered Red Dog's history of alcohol and/or drug dependence.[14] It noted that in addition to the murder of Hugh Pennington, alcohol appeared to have played a role in the murders of Large and John in California. Alcohol was also a factor in the robbery of Veseth in 1973 and Red Dog's possession of a loaded handgun in 1986. Red Dog continued to consume alcohol while he was incarcerated. The Superior Court concluded that "there is no doubt that Red Dog's dependence on alcohol and drugs has significantly affected him adversely throughout his adult life. [The Superior Court] consider[ed] and accept[ed] this as a mitigating circumstance."

Third, the Superior Court considered Red Dog's personality disorder. While the evidence was conflicting,[15] the Superior Court accepted the evidence supportive of a Personality Disorder as credible and reliable. Specifically, it stated:

Red Dog's Personality Disorder could well have resulted from the circumstances surrounding his early life. He was raised in relative poverty on the Fort Peck Sioux Indian Reservation in Montana. He has claimed, and the Court accepts, that his father drank heavily and supported his family through gambling and that his mother who also drank heavily helped support the family through prostitution. He had two half-brothers and eight sisters, and, as such, lacked an identity of his own. He turned to alcohol at a young age. There is every indication that as he grew older, he became aware of his noble heritage and the circumstances surrounding the emasculation and decimation of a once proud Indian nation.

The Court acknowledges the deprivations to which Red Dog has been exposed and the maladaptive personality traits resulting therefrom which the Court considers as a mitigating circumstance in this case.

### Death Sentence Not Arbitrary or Capricious

■ The Superior Court expressed the basis for its decision to sentence Red Dog to death in a comprehensive and thoughtful thirty-six page written opinion. The Superior Court determined that the aggravating circumstances, which it found to exist, "clearly" outweighed the mitigating circumstances which it also found to exist. The Superior Court concluded its sentencing analysis by stating:

James A. Red Dog has traversed an often gruesome trail of violence for his entire adult life. He was involved in the murder of four other persons prior to the death of Hugh Pennington. Even while incarcerated, his criminal pursuits have

---

13. The Superior Court noted that voluntary intoxication is not a defense under Delaware law. *See* 11 *Del.C.* § 421; *Wyant v. State,* Del.Supr., 519 A.2d 649 (1986). Further, addiction to an intoxicating substance does not make the consumption of that substance involuntary. *Polk v. State,* Del.Supr., 567 A.2d 1290 (1989). Such factors have been recognized as constituting a mitigating circumstance. *See Fead v. State,* Fla. Supr., 512 So.2d 176 (1987); *Norris v. State,* Fla.Supr., 429 So.2d 688 (1983).

14. The Superior Court noted that substantial evidence of a defendant's long history of alcohol and/or drug abuse has been recognized as a mitigating circumstance which must be considered in the weighing process. *See Hall v. State,*

Fla.Supr., 541 So.2d 1125 (1989); *Amazon v. State,* Fla.Supr., 487 So.2d 8 (1986).

15. In rejecting Dr. Lahvis's opinion that Red Dog suffered from an organic brain disorder, the Superior Court noted that Dr. Lahvis was a family practitioner with no professional expertise in psychology, psychiatry, neurology or forensic medicine. The Superior Court also noted that Dr. Lahvis had never personally examined Red Dog. His diagnosis was based solely on a review of Red Dog's medical records and articles he had read. The Superior Court also specifically noted that Red Dog had been tested for organic brain damage and the results were within normal limits.

gone unabated. His propensities for violence span two decades.

I can discern not a spark of redemption which might release the defendant from his sordid and destructive nature. The evidence of the defendant's violent past is a predictive indicator of what his future holds, even if separated from decent society.

With solemn recognition that "death as a punishment is unique in its severity and irrevocability," ... the Court nonetheless concludes that the death penalty is eminently justified under the circumstances of this case. James Allen Red Dog has forfeited his right to life; surely, his life is no more sacred than that of his innocent 30 year old victim, Hugh Pennington.

The record reflects that the Superior Court judge carefully considered the totality of the evidence in aggravation and mitigation, which related to the particular circumstances of the murder of Hugh Pennington and the character and propensities of Red Dog. 11 *Del.C.* § 4209(g)(2). The record reflects that the Superior Court's decision to impose the death sentence was the product of a deliberate, rational and logical deductive process. *Pennell v. State*, 604 A.2d at 1376. After a careful review of the entire record, this Court concludes that the sentence of death was not imposed upon Red Dog by the Superior Court either arbitrarily or capriciously.

### *Remark at Sentencing*

Red Dog's attorneys have challenged a statement made by the Superior Court in a single sentence, at the very end of its thirty six page written sentencing analysis. The statement at issue is:

> James Allen Red Dog has forfeited his right to life; surely, his life is no more sacred than that of his innocent 30 year old victim, Hugh Pennington.

Red Dog's attorneys contend that the forgoing comment by the sentencing judge "while accurate is legally erroneous." Red Dog's attorneys did not object to that statement at the time it was made in the Superior Court.

This Court does not review claims on appeal which were not raised and fairly presented to the trial court for decision, unless such review is required in the interest of justice, i.e., the plain violation of a fundamental right. Supr.Ct.R. 8; D.R.E. 103(d); *Gordon v. State*, Del.Supr., 604 A.2d 1367 (1992); *Tucker v. State*, Del. Supr., 564 A.2d 1110, 1117–18 (1989); *Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100 (1986). Having failed to object to the comment by the sentencing judge when it was made in the Superior Court, Red Dog has waived the right to challenge it on appeal, unless he can demonstrate plain error. Red Dog's attorneys have not cited a single authority to support the contention that the Superior Court's comment at sentencing was erroneous.

The United States Supreme Court has recently held that the United States Constitution does not bar State law from permitting the prosecution to remind "the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne v. Tennessee*, —— U.S. ——, ——, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991) (quoting *Booth v. Maryland*, 482 U.S. 496, 517, 107 S.Ct. 2529, 2540, 96 L.Ed.2d 440 (1987) (White, J. dissenting)). Subsequent to *Payne*, this Court has held that Delaware's death penalty statute *does* permit the prosecution to present victim impact evidence to the sentencer for consideration. *Petition of State of Delaware*, Del.Supr., 597 A.2d 1 (1991). Thus, Red Dog's contention that the comment about the victim by the sentencing judge constituted plain error is contrary to the recent holdings of the United States Supreme Court and of this Court. *Id.; Payne v. Tennessee*, —— U.S. ——, ——, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991). Accordingly, we conclude that challenge is without merit.

### *Proportionality Review*

There is one remaining question which we must now address in this automatic review. Was the Superior Court

judge's imposition of the death penalty upon Red Dog disproportionate to the penalty recommended in cases arising under the Delaware capital punishment statute? To answer that final inquiry, this Court has reviewed the "universe" of cases established in *Flamer, Riley, DeShields, Dawson,* and *Pennell,* as well as all of the subsequent cases falling therein. *Pennell v. State,* Del.Supr., 604 A.2d 1368, 1378 (1992); *Dawson v. State,* Del.Supr., 581 A.2d 1078, 1109 (1990); *DeShields v. State,* Del.Supr., 534 A.2d 630, 654 (1987); *Riley v. State,* Del.Supr., 496 A.2d 997, 1027–28 (1985); *Flamer v. State,* Del.Supr., 490 A.2d 104, 140 (1983); (Appendix I).[16] The "universe" of cases is comprised of those First Degree Murder cases which have gone to a penalty hearing and where the sentence has become final, either without or following a review by this Court.

A definitive comparison of the "universe" of cases is almost impossible. *Pennell v. State,* 604 A.2d at 1376; *Riley v. State,* 496 A.2d at 1027; *Flamer v. State,* 490 A.2d at 144. Nevertheless, we have compared Red Dog's sentence with the penalties in all First Degree Murder cases which have gone to a death penalty hearing. We have also considered objective factors such as the gravity of the offense, the circumstances of Red Dog's crime, and the harshness of the penalty. *See Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983).

All of the penalty hearings in the "universe" of cases which preceded *Pennell* were conducted before a jury. In this matter, as in *Pennell,* Red Dog waived his right to a jury during the penalty hearing. *Pennell v. State,* 604 A.2d at 1377. As this Court held in *Pennell,* the fact that Pennell, like Red Dog, was sentenced to death by a judge, rather than a jury, does not change the nature of this Court's comparative analysis. *Id.*

In conducting its proportionality review, this Court has also examined the factual background of the applicable "universe" of cases. Our examination reveals that Red Dog, like other defendants sentenced to death in Delaware, was found guilty of committing an unprovoked, cold-blooded, execution-style murder of a person who lacked the ability to defend himself, e.g., *Pennell v. State,* 604 A.2d at 1377; *DeShields v. State,* 534 A.2d at 649; *Riley v. State,* 496 A.2d at 1027. Our examination also reveals that, when Pennell was sentenced to death for the murders of Kathleen Meyer and Michelle Gordon, he was unique among the "universe" of Delaware defendants because the record reflected, beyond a reasonable doubt, that he was a relentless serial murderer. *Pennell v. State,* 604 A.2d at 1378.[17]

The circumstances presented during the penalty hearing in *Pennell* and at the penalty hearing in Red Dog's case are strikingly similar. At the time Steven Pennell was sentenced to death, he had been convicted of murdering four individuals, each on separate occasions. *Id.* at 1377. When Red Dog was sentenced to death, he had been convicted of three separate murders (John, Large, and Pennington), had admitted a fourth (Veseth), and was involved in a fifth (Ortega). Pennell's murder victims were rendered helpless by binding before their deaths. Hugh Pennington, as well as John and Large, were each bound before their deaths by Red Dog. Red Dog, like Steven Pennell, committed multiple execution style murders "on separate occasions, in a similar manner, over a period of time, with no apparent motive other than to inflict pain and death." *Id.*

Red Dog has joined Steven Pennell in the serial murderer subset of Delaware's "uni-

---

**16.** David Dawson's death sentence was vacated by the United States Supreme Court — U.S. ——, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992). Dawson's case, which has been remanded to the Superior Court for a new penalty hearing, is not in the "universe" of cases at this time. *Dawson v. State,* Del.Supr., 608 A.2d 1201 (1992).

**17.** Several other defendants sentenced to death in Delaware, have been found guilty of causing the death of two or more persons during the *same* course of conduct, e.g., *Deputy v. State,* Del.Supr., 500 A.2d 581, 602 (1985); *Bailey v. State,* Del.Supr., 490 A.2d 158, 173 (1983) and *Bailey v. State,* Del.Supr., 503 A.2d 1210, 1211 (1984); and *Flamer v. State,* 490 A.2d at 123–24.

verse" of cases. However, a prior history of homicidal acts is not, and clearly has never been, the *sine qua non* for reviewing Delaware's "universe" of cases to determine the proportionality of a death sentence. In fact, in affirming the death sentences for convicted serial murderer Steven Pennell, this Court held that the cruel and outrageous nature of the deaths of each helpless victim, when compared to the "universe" of Delaware cases, demonstrated the appropriateness of a death sentence, without regard to any prior homicidal conduct. *Pennell v. State*, 604 A.2d at 1378. The same conclusion is compelled in Red Dog's case.

Hugh Pennington's death was cruel and outrageous. He was rendered helpless by binding before being virtually decapitated by Red Dog for no apparent reason other than to inflict pain and death. The record reflects that Red Dog's sentence of death for the murder of Hugh Pennington was proportionate when compared with the sentences imposed in Delaware's "universe" of cases. *Accord Pennell v. State*, 604 A.2d at 1378.

## CONCLUSION

This Court has determined that the facts supporting the sentence of death which was imposed upon Red Dog by the Superior Court judge for the murder of Hugh Pennington "are so clear and convincing that virtually no reasonable person could differ." *Pennell v. State*, 604 A.2d at 1378. *Accord Dobbert v. Florida*, 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). This Court concludes that the death sentence imposed upon Red Dog is "not comparatively disproportionate to the sentences in the other First Degree Murder cases that have proceeded to a penalty hearing pursuant to the Delaware capital punishment statute, and in which at least one statutory aggravating circumstance was found to exist by the jury." *Pennell v. State*, 604 A.2d at 1378. Therefore, the judgment of the Superior Court, to sentence Red Dog to death for the murder of Hugh Pennington, is AFFIRMED.

The matter is remanded to Superior Court for further proceedings in accordance with this opinion. This Court's order of April 20, 1992, staying the execution of Red Dog's death sentence, shall terminate upon the issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be hand-delivered forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

## APPENDIX I
### FIRST DEGREE MURDER CASES THAT WENT TO PENALTY HEARINGS
#### 1985 to date

Case Name: Meri–Ya C. Baker
Case No.: IN90–12–1039, 1040
County: New Castle
Sentence: Life Imprisonment

Case Name: William P. Baynard
Case No.: S84–050137, 0141
County: New Castle
Sentence: Life Imprisonment

Case Name: Ransford Bryan
Case No.: S87–11–0063
County: Sussex
Sentence: Life Imprisonment

Case Name: Vicky Chao
Case No.: IN88–031025–1025 & 1027, 1028
        IN88–0832–0836
County: New Castle
Sentence: Life Imprisonment

Case Name: Carmelo J. Claudio
Case No.: IN87–030067–68

| | |
|---|---|
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Charles M. Cohen |
| Case No.: | IN90–02–0474 thru 0477 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Lawrence R. Collingwood, Jr. |
| Case No.: | K87–09–0895 thru 0901 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | David F. Dawson* |
| Case No.: | IK87–010834 thru 0847 |
| County: | Kent |
| Sentence: | Penalty hearing pending |
| Case Name: | Kenneth W. DeShields |
| Case No.: | IS84–080075–1075, –1275, –2075 |
| County: | Sussex |
| Sentence: | Death |
| Case Name: | Byron S. Dickerson |
| Case No.: | IN90–12–1041, 1042 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Sebron Ernest Flemming, III |
| Case No.: | IN90–09–1047 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Edward A. Fountain, Jr. |
| Case No.: | IN84–120293 thru 0297 |
| | IN84–121795 thru 1797 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Robert Allen Gattis* |
| Case No.: | Cr.A. No. IN90–05–1017 thru 1019 |
| | Cr.A. No. IN90–05–1106–1107 |
| County: | New Castle |
| Sentence: | Death—automatic appeal pending |
| Case Name: | Randolph Graham |
| Case No.: | IK86–010059 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | James E. Harris, Jr. |
| Case No.: | IN90–08–0479; 0498 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Charles K. Kelly |
| Case No.: | IN85–10–1671, 1672, 1673 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Tze Poong Liu |
| Case No.: | IN88–03–1013 thru 1015 |
| | IN88–04–0838 thru 0840 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | James Edward Llewellyn |
| Case No.: | IN91–01–1135, 1137, 1140 and 1142 |
| | IN91–01–1136, 1138, 1141, 1143, 1146 |

IN91–01–1139 and 1144
IN91–01–1145
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Christopher Delamore Long, Jr.
Case No.:   IN91–01–1109 thru 1121
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Joyce L. Lynch
Case No.:   IK88–010040
County:     Kent
Sentence:   Life Imprisonment
Case Name:  Stanley Newell
Case No.:   IN89–006109
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Ernest Charles Parson, Jr.
Case No.:   IN86–120380, 86–11136–1137
            IN86–1144, 1147, 0381–0383, 1135
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Steven B. Pennell
Case No.:   IN88–120051–0053
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Steven B. Pennell
Case No.:   IN91–07–0114; 0115
County:     New Castle
Sentence.:  Death
Case Name:  Vincent Perry
Case No.:   IN85–101668–1673
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Maurice Polk
Case No.:   S87–12–0093
County:     Sussex
Sentence:   Life Imprisonment
Case Name:  James Allen Red Dog*
Case No.:   IN91–02–1495 to 1503
County:     New Castle
Sentence:   Death—present proceeding
Case Name:  Paul Arnold Robertson, Jr.
Case No.:   IN91–01–1148 thru 1160
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Kenneth Louis Rodgers
Case No.:   IN91–01–1109 thru 1160
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Frederick James Ropp
Case No.:   IN84–101691, 1692
County:     New Castle
Sentence:   Life Imprisonment
Case Name:  Reginald N. Sanders
Case No.:   IK86–030898 thru 0903
County:     Kent

| | |
|---|---|
| Sentence: | Life Imprisonment |
| Case Name: | Reginald N. Sanders |
| Case No.: | IK86–03–0898, 0899, and 0903 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Christie C. Shipley |
| Case No.: | IK85–020820 and 0821 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Melvin Smart |
| Case No.: | S84–08–0037 and S84–08–0038 |
| County: | Sussex |
| Sentence: | Life Imprisonment |
| Case Name: | Desi Sykes |
| Case No.: | IK88–11005 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Richard C. Thompson |
| Case No.: | IK86–010059 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Charles H. Trowbridge* |
| Case No.: | Cr.A. No. IK91–07–0175 |
| | Cr.A. Nos. IK91–09–0032 thru 0034 |
| County: | New Castle |
| Sentence: | Penalty hearing complete—to be sentenced |
| Case Name: | Frank C. Whalen, Jr. |
| Case No.: | IK77–0–0035, 0036; IK76–030029 |
| County: | New Castle (venue changed) |
| Sentence: | Life Imprisonment |
| Case Name: | Lonnie Williams |
| Case No.: | IN89–08–0638 thru 0645 |
| | IN89–09–0938 thru 0943 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Jermaine M. Wright* |
| Case No.: | Cr.A. Nos. IN91–04–1047 thru 1953 |
| County: | New Castle |
| Sentence: | Death—automatic appeal pending |

The "universe" of cases is comprised of those First Degree Murder cases which have gone to a penalty hearing and where the sentence has become final, either without or following a review by this Court. An asterisk marks those capital murder cases which are not included in the defined "universe" of cases.