Jermaine M. WRIGHT, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 8, 1993.
Decided: Nov. 17, 1993.

Joseph M. Bernstein, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., and Timothy J. Donovan, Jr., Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellee.

Before VEASEY, C.J., HORSEY, MOORE, WALSH, and HOLLAND, JJ., constituting the Court en banc.

WALSH, Justice.

This is an appeal from the imposition of the death sentence in the Superior Court. The appellant, Jermaine Wright, was convicted of two counts of Murder First Degree, Robbery First Degree and related weapons offenses. Pursuant to 11 *Del.C.* § 4209(c)(3), a jury unanimously found the existence of circumstances statutorily mandating the imposition of the death sentence and the Superior Court concurred in that determination. Wright asserts various claims of error in this appeal with particular emphasis on the Superior Court's refusal to suppress his statement to police after a prolonged detention. We find no merit in any of the claims asserted and affirm the convictions. After performing

our statutorily mandated review, we also affirm the sentence imposed.

## I

The essential facts underlying Wright's conviction are not in serious dispute. On the evening of January 14, 1991, Debra Milner was working at the bar of the Hi–Way Inn, a combination bar and liquor store located on Governor Printz Boulevard near Wilmington. Philip Seifert was working in the adjacent liquor store. At around 9:20 p.m., Milner observed a black man in his mid-twenties enter the bar, look around, and leave without making a purchase. At about 10:20 p.m., the liquor store door bell rang, indicating that someone had entered. Seifert went to wait on the customer while Milner answered the telephone.

While she was on the telephone, Milner heard the bell ring again and assumed that the customer had left the liquor store. She then heard the bell ring a third time followed by a noise that she thought sounded like a firecracker. Assuming someone was playing a prank, Milner walked toward the passageway to the liquor store to investigate. Through the passageway, she saw Seifert slumped across the counter. She could not see the customer area of the liquor store from her vantage point. She then heard a gunshot and upon a closer view saw blood around Seifert. Fearing for her safety, Milner ran and hid in a room near the kitchen. Later, she ran back through the bar and out its front door where she saw a customer she recognized, George Hummell, making a telephone call.

Hummell, a machinist inspector employed by Amtrak, was on his way to work and intended to stop at the Hi–Way Inn to cash a check. He was a regular customer and knew both Milner and Seifert. As he was waiting to make a left turn into the parking lot, he saw two men leave the liquor store. Hummell observed one of the men, the shorter of the two, return to the store while the other ran across the parking lot. After a short interval, the man who had re-entered the liquor store came back outside, ran across the road and entered a black Volkswagen in a parking lot across the street. The other man ran down the sidewalk and disappeared into the night. According to Hummell, the man who returned to the store and then left again was black, about 5′ 8″ tall, while the other man was also black and about 6′ tall.

Suspicious of what he had observed, Hummell walked into the bar area, which was empty. He called out the names of several employees of the Hi–Way Inn, but there was no response. Hummell walked out of the bar and into the liquor store. He then saw Seifert with his head on the counter and bleeding from a head wound. Hummell immediately walked to the vestibule and dialed 911.

Sergeant Gary Kresge, the first police officer to arrive at the scene, saw Seifert lying on his back on the floor behind the counter. The cash register drawer was open and approximately $30 had been stolen. Later Seifert was pronounced dead as a result of gunshot wounds. He had been shot three times, once in the neck and twice in the head.

Detective Edward Mayfield of the Delaware State Police was assigned to investigate Seifert's murder and robbery. Through an employee of the Hi–Way Inn, which had offered a reward for information leading to an arrest for the crimes, Mayfield received a tip that the perpetrators were "Marlo," an alleged drug dealer who lived on East 28th Street in Wilmington, and another man, "Tee." With the help of Wilmington police, Mayfield learned that "Marlo" was Jermaine Marlo Wright, while "Tee" was the "street name" of Lorinzo Dixon. On the basis of this tip and Hummell's description of the men he saw leaving the scene, Wright was developed as a suspect in the Hi–Way Inn murder/robbery. However, police did not have probable cause to arrest him for those crimes at that time.

In addition to the Hi–Way Inn murder/robbery, Wright was a suspect in two random shootings under investigation by Wilmington police. One shooting, being investigated by Detective Robert Merrill, involved a young boy, Emil Watson, who had been shot in the foot while riding his bicycle. The other, being investigated by Detective Robert Moser, involved the shooting of a young girl in a nearby park. Merrill obtained a

warrant to arrest Wright for the Watson shooting and a warrant to search Wright's residence for guns and ammunition.

On January 30, 1991, at approximately 6:00 a.m., the warrants were executed.[1] Because of a belief that Wright was heavily armed, a SWAT team entered and secured the premises and its occupants. Detectives Mayfield, Merrill, and Moser were among those executing the warrants. Wright was arrested for assault and transported to the Wilmington Police Department between 8:00 and 9:00 a.m. He was then processed while the detectives were involved in a number of activities including a SWAT team debriefing, securing evidence that had been seized, interviewing another person who had been arrested at the Wright residence, and attending strategy sessions.

At approximately 12:00 p.m., Wright was first interviewed. After reading Wright the *Miranda*[2] warnings, Detective Merrill questioned him for about 45 minutes regarding the Emil Watson shooting. Detective Moser then entered the room to interview Wright about the park shooting. After again receiving his *Miranda* warnings, Wright talked with Moser about that shooting for about 45 minutes. The interview then turned to other subjects, with Wright volunteering information regarding other criminal activity about which he had knowledge. Except for a few short breaks, during which Wright was provided with sodas, a sandwich, and opportunities to use the restroom, Moser was alone with Wright from the time the interview started until approximately 7:30 p.m. Detective Mayfield was listening to the conversation in an adjoining room through a speaker

system and conferred with Moser during breaks in the questioning.

Most of this six hour discussion focussed on the Hi–Way Inn murder/robbery. Eventually, Wright implicated himself in the crimes. At that point, about 7:00 p.m., Mayfield came to the interview room and told Wright he wanted to take a videotaped statement from him concerning what he had told Moser. Mayfield conducted the videotaped interview from 7:35 to 8:20 p.m., at the beginning of which Wright was again given *Miranda* warnings.[3]

In his statement to police, Wright claimed that on the night of the murder Dixon[4] came to him and told him he knew of a place where someone was working alone. They drove to the Hi–Way Inn in a stolen black Volkswagen Jetta. Seifert refused to cooperate when they demanded money, and Dixon told Wright to shoot Seifert or he (Dixon) would kill Wright. Wright then shot Seifert once in the back of the head and then fled.[5] Following his videotaped statement, Wright was arrested for the Hi–Way Inn killing and taken to Municipal Court where bail was set on the assault charge and then to Justice of the Peace Court No. 11 for presentment on the Hi–Way Inn charges.

Based on the foregoing, Wright was convicted of two counts of Murder First Degree (intentional and felony-murder), Robbery First Degree, and three counts of Possession of a Deadly Weapon During the Commission of a Felony. The jury unanimously found that the State had established two statutory aggravating circumstances—the murder was committed in the course a robbery, 11 *Del.C.* § 4209(e)(1)(j), and the victim was 62 years

---

1. Prior to trial, Wright filed a motion to suppress his statements made to police, claiming that the warrants were executed prior to 6:00 a.m., in violation of prohibition against nighttime searches, *see* 11 *Del.C.* § 2308, and that they were not supported by probable cause. The Superior Court rejected these claims and denied the motions to suppress. That ruling is not challenged in this appeal.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Before trial, Wright sought to have his statements suppressed, claiming they were involuntary because he was high on heroin at the time

and merely told the police what they wanted him to say. The trial court denied the motion to suppress, although the voluntariness issue was preserved for jury determination. This issue has not been pursued on appeal.

4. Dixon subsequently pled guilty to Robbery First Degree and Possession of a Deadly Weapon During the Commission of a Felony.

5. In his statement, Wright minimized his role in the murder. The testimony of witnesses Milner and Hummell indicates that after leaving the liquor store, Wright returned and fired two more shots into Seifert.

of age or older, 11 *Del.C.* § 4209(e)(1)(r)—and that the aggravating circumstances outweighed the mitigating circumstances.

The Superior Court, charged with the ultimate responsibility for determining whether the death sentence should be imposed, also found that the State had established the two statutory aggravating circumstances in addition to three non-statutory aggravating circumstances—Wright's career as a drug dealer, the Emil Watson shooting, and the brutality of the Seifert murder. The trial court, which had ordered a presentence investigation of Wright, also discussed Wright's "evolving pattern of violence" in its sentencing decision and concluded that the aggravating circumstances "completely overwhelm[ed]" the mitigating circumstances. Therefore, in accordance with 11 *Del.C.* § 4209(d), the Superior Court sentenced Wright to death by lethal injection on both murder convictions.[6]

## II

Wright raises five separate claims on appeal: (1) his incriminating statements should have been suppressed because they were obtained following an unreasonable delay between arrest and initial presentment; (2) jury instructions during the penalty phase of his trial were insufficient in defining mitigating circumstances; (3) the trial judge erred in her determination of non-statutory aggravating circumstances and mitigating circumstances; (4) imposition of the death sentence was disproportionate to the penalty imposed in similar cases; and (5) application to Wright of the death penalty statute, 11 *Del.C.* § 4209, as revised after the date of the offenses, violated the *Ex Post Facto* Clause of the United States Constitution. We address each of these contentions in turn. In doing so, we also perform our statutorily mandated review of the sentence imposed. 11 *Del.C.* § 4209(g).

## A.

Wright claims that the police violated Superior Court Criminal Rule 5(a)[7] and 11 *Del.C.* § 1909[8] by interrogating him about the Hi–Way Inn murder when he was in custody for the unrelated assault charge. He argues that since Rule 5(a) and § 1909 require police to bring an arrested person before a magistrate "without unreasonable delay," he should have been brought to Municipal Court promptly after he was booked on the assault charge and the police had secured all evidence retrieved from his residence. Instead, he was questioned for a total of eight and one-half hours, first about the assault charge, then the park shooting, and finally the Hi–Way Inn homicide. Consequently, Wright concludes that his incriminating statements, the product of "unreasonable delay," should have been suppressed under *Vorhauer v. State*, Del.Supr., 59 Del. 35, 212 A.2d 886 (1965), the Delaware decision adopting the federal *McNabb–Mallory* rule.[9]

The trial court, after conducting a suppression hearing and thoroughly reviewing the facts and applicable Delaware law, ruled that the delay was not unreasonable and denied Wright's motion to suppress. Our standard of review is whether the factual determination of the trial court that the delay was not unreasonable is sufficiently supported by the record and the product of an orderly and

---

6. Wright was also sentenced to 20 years in prison for the robbery conviction and 30 years for the weapons offenses.

7. Rule 5(a) provides in pertinent part: "An officer making an arrest under a warrant issued upon a complaint ... shall take the arrested person without unreasonable delay before the nearest available magistrate...."

8. "If not otherwise released, every person arrested shall be brought before a magistrate without unreasonable delay, and in any event he shall, if possible, be so brought within 24 hours of arrest...."

9. Derived from *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1942) and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the rule requires suppression of any confession or incriminating statement obtained during an unlawful detention. The exclusionary rule of *Vorhauer* and *McNabb–Mallory* does not rest upon constitutional grounds; it is a court designed rule to effectuate the orderly administration of justice. *Webster v. State*, Del.Supr., 213 A.2d 298, 301 (1965).

logical deductive process. *Palmer v. State,* Del.Supr., 626 A.2d 1358, 1363 (1993); *Hopkins v. State,* Del.Supr., 501 A.2d 774, 776 (1985).

■ Since Wright was arrested pursuant to a valid warrant, the Fourth Amendment is not implicated in this appeal. *Cf. County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).[10] Wright concedes that the question of whether there was unreasonable delay is purely one of statutory construction under Delaware law. *Webster v. State,* Del.Supr., 213 A.2d 298, 301 (1965). While § 1909 refers to a 24–hour period in establishing that a person should be brought before a magistrate without unreasonable delay, this Court has observed that "[t]he reference to a 24–hour period is to an exception, not a norm, and it is not an outer limit within which a detention period is presumptively permissible." *Warren v. State,* Del.Supr., 385 A.2d 137, 142 (1978).

■ "Whether a statement otherwise admissible is inadmissible as a product of unreasonable delay under § 1909 is to be determined after consideration of the totality of the circumstances." *Hopkins,* 501 A.2d at 776. Each case must be judged on its own facts and among the factors to be considered are the length of the delay and the atmosphere surrounding the detention. *Deputy v. State,* Del.Supr., 500 A.2d 581, 589 (1985). Here, Wright was in custody for about 13½ hours before he gave his videotaped statement. *See Hopkins,* 501 A.2d at 777 (significant hours of detention are those occurring before confession). Further, there is no claim that the police treated Wright improperly since he was given food, drink, and opportunities to use the restroom and he conversed willingly during the entire period of questioning. *See Fullman v. State,* Del. Supr., 389 A.2d 1292, 1298 (1978) ("atmo-

sphere of cordiality and mutual trust permeated the proceedings").

Recognizing that in *Fullman* and *Deputy* we found pre-statement delays of 20 hours not to have been unreasonable, Wright instead argues that any delay to question a person arrested for one crime about an unrelated crime is unreasonable. Thus, Wright argues, since he was arrested for assault, it was unreasonable for police to question him about the Hi–Way Inn homicide. Wright cites several federal cases arguably standing for this proposition. *United States v. Alvarez–Sanchez,* 9th Cir., 975 F.2d 1396, 1405 (1992); *cert. granted,* —— U.S. ——, 114 S.Ct. 299, 126 L.Ed.2d 247 (1993); *United States v. Wilson,* 9th Cir., 838 F.2d 1081, 1085 (1988); *United States v. Perez,* 2d Cir., 733 F.2d 1026, 1035–36 (1984); *Adams v. United States,* D.C.Cir., 399 F.2d 574, 577 (1968), *cert. denied,* 393 U.S. 1067, 89 S.Ct. 722, 723, 21 L.Ed.2d 710 (1969). However, Wright's reliance on those cases is unavailing. First, they involve the interpretation of Federal Rule of Criminal Procedure 5(a) and 18 U.S.C. § 3501, which are dissimilar to the rule and statute implicated here.[11] Further, the federal courts are not in agreement as to the effect of an unnecessary delay under § 3501. *See United States v. Christopher,* 6th Cir., 956 F.2d 536, 538 (1991) (distinguishing *Wilson* and *Perez* and observing that the rule in most circuits "is that unnecessary delay, standing alone, is not sufficient to justify the suppression of an otherwise voluntary confession").[12]

■ Under Delaware law, questioning a person about a crime other than the one for which he was arrested is not *per se* unreasonable. In *Fullman,* the defendant voluntarily surrendered on a charge of possession of a deadly weapon by a person prohibited, agreed to take a polygraph test, and was

**10.** In *McLaughlin* the Supreme Court held that a delay of up to 48 hours before presentment for those arrested *without a warrant* will generally comply with Fourth Amendment requirements. 500 U.S. at ——, 111 S.Ct. at 1670.

**11.** Fed.R.Cr.P. 5(a) concerns "unnecessary delay" while Super.Ct.Cr.R. 5(a) deals with "unreasonable delay." 18 U.S.C. § 3501 contains a six-hour presentment provision while 11 *Del.C.*

§ 1909 has a 24–hour provision. Thus, federal law appears, at least on the surface, to be more protective of an accused's right to a swift presentment.

**12.** The Supreme Court's grant of certiorari in *Alvarez–Sanchez* may resolve this conflict. However, it will not control Wright's claim, which is bottomed on state law.

questioned for nine hours about the shooting of a police officer before implicating himself in the shooting. We held that the confession was valid. 389 A.2d at 1298. Wright seeks to distinguish *Fullman* because the defendant there voluntarily surrendered while Wright was arrested during a raid on his residence. This distinction is not pertinent to the analysis. Both Wright and Fullman were arrested on one charge and questioned about another. The fact that one appeared at the police station voluntarily while the other was taken there may be considered as an element in the "totality of the circumstances." [13] It does not foreclose the result.

■ Wright was arrested shortly after the 6:00 a.m. raid on his residence. After administrative matters were concluded, questioning of him began around noon. For the next eight and one-half hours, he willingly spoke with detectives concerning various crimes about which he had knowledge, waiving his *Miranda* rights three times. He was given food, drink, and opportunities to use the restroom in a non-threatening atmosphere. As counsel for the State observed at oral argument, the length of the interrogation and resulting delay in presentment was largely the result of the fact that Wright had a lot to say and was willing to say it. Under such circumstances, the trial court's determination that there was no unreasonable delay is clearly supported by the record and the product of an orderly and logical deductive process. Consequently, Wright's first claim of error must be rejected.

### B.

■ Under Delaware law, as revised in 1991, a sentence of death may be imposed only under the bifurcated procedure prescribed by 11 *Del.C.* § 4209. That statute requires the jury to determine, during the penalty phase, (1) whether the evidence shows beyond a reasonable doubt the existence of at least one statutory aggravating circumstance and (2) whether, by a preponderance of the evidence, the aggravating circumstances outweigh any mitigating circumstances found to exist. 11 *Del.C.* § 4209(c). The trial court, after considering the recommendation of the jury, is to decide the same questions. If the court concludes that the answer to both questions is in the affirmative, it must impose a sentence of death; otherwise, it must impose a sentence of life imprisonment without the possibility of probation, parole, or other reduction in sentence. 11 *Del.C.* § 4209(d). Thus, the Superior Court bears the ultimate responsibility for imposition of the death sentence while the jury acts in an advisory capacity "as the conscience of the community." *State v. Cohen*, Del.Supr., 604 A.2d 846, 856 (1992).

Wright claims the jury instructions given during the penalty phase of his trial were insufficient with respect to the definition of mitigating circumstances. The trial court defined a mitigating circumstance as "any factor which tends to make the defendant's conduct less serious or the imposition of a penalty of death inappropriate." Wright contends that the court should have instructed the jury that his age (18 at the time of the offense) and family background could be considered by it to be mitigating circumstances.

The jury instructions used at trial were patterned after those approved by this Court in *Flamer v. State*, Del.Supr., 490 A.2d 104 (1983), and *Riley v. State*, Del.Supr., 585 A.2d 719 (1990). *See Riley*, 585 A.2d at 730 (appendix A & B) (approved instructions). The only significant modifications were the result of the 1991 amendments to the death penalty statute, 11 *Del.C.* § 4209. The definition of a mitigating circumstance used by the trial court is identical to that used in *Flamer* and *Riley*.

■ At trial, Wright did not request a specific instruction with respect to the definition of mitigating circumstances nor did he

---

**13.** Wright's also relies on *Palmer v. State*, Del. Supr., 626 A.2d 1358 (1993). However, *Palmer* involved a juvenile whose presentment to a Family Court Commissioner was unnecessarily delayed in violation of 10 *Del.C.* § 933 and Family Court Rule 5(b). In *Palmer*, we rejected the State's reliance on *Hopkins v. State*, Del.Supr., 501 A.2d 774 (1985), a case interpreting 11 *Del.C.* § 1909 and Superior Court Criminal Rule 5(a), since a different statute and rule were implicated because the defendant was a minor. 626 A.2d at 1363–64. For the same reasons, Wright's reliance on *Palmer* is misplaced.

raise any objection to the instruction as given by the court. Since no objection was raised below, our standard of review is plain error. *Sanders v. State*, Del.Supr., 585 A.2d 117, 132–33 (1990). *See* Supr.Ct. Rule 8.

Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.

*Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100 (1986). Because the error alleged here relates to the deficiency of instructions in the penalty phase of a capital murder trial, any such error would be of constitutional dimension. In view of the resulting imposition of the death sentence, any such error would clearly be fundamental in character and deprive the defendant of a substantial right. Accordingly, we review Wright's claim under a plain error standard. *Sanders*, 585 A.2d at 133.

■ Wright's argument on this point is essentially two-fold. As noted above, he argues that the jury should have been specifically instructed that his age and family background could be considered mitigating circumstances. He also appears to suggest that since the penalty phase hearing in his case was very brief, lasting less than a hour, the jury should have been given additional guidance by the trial judge with respect to mitigating circumstances. To the extent that Wright's argument contains an implication of ineffective representation by counsel at the penalty hearing because counsel did not request additional instructions, that claim will not be considered at this stage because it was not raised below. *Duross v. State*, Del. Supr., 494 A.2d 1265 (1985).[14]

Wright's argument that the jury instructions given during his penalty phase failed to satisfy the Eighth and Fourteenth Amendments to the United States Constitution clearly fails in light of the United States Supreme Court's recent holding in *Johnson v. Texas*, —— U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). Nonetheless, a review of the relevant Supreme Court decisions is necessary for an understanding of the constitutional standards which must be satisfied before the ultimate sentence of death can be imposed on an individual. The first case in the decisional line is *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Prior to *Furman*, sentencing juries had almost complete discretion in determining whether a sentence of death would be imposed, resulting in a system in which there was no meaningful basis for distinguishing the few cases in which the death sentence was imposed and the many cases in which it was not. *Johnson*, —— U.S. at ——, 113 S.Ct. at 2664. Although the Court was divided in many respects, the majority held that such a system was "cruel and unusual" within the meaning of the Eighth Amendment. The "guiding principle that emerged from *Furman* was that States were required to channel the discretion of sentencing juries in order to avoid a system in which the death penalty would be imposed in a wanton and freakish manner." *Johnson*, —— U.S. at ——, 113 S.Ct. at 2664 (internal quotation marks and citations omitted).

Four years later, the Court decided five cases involving the constitutionality of capital sentencing schemes with opinions issued the same day. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). While the Court was again seriously divided, two principles emerged. First, *Furman's* requirement of directed and limited discretion so as to minimize the risk of an arbitrary or capricious

14. Wright may, of course, raise such a claim in a motion for post-conviction relief under Super.Ct.Cr.R. 61. *Duross*, 494 A.2d at 1269.

result was reaffirmed. Second, consideration of the character and record of the offender and the circumstances of the offense was held to be constitutionally required. Accordingly, statutes providing for mandatory imposition of the death sentence upon conviction of specified crimes were struck down as inconsistent with the Eighth and Fourteenth Amendments. *See Johnson,* —— U.S. at ——, 113 S.Ct. at 2665.

Two terms later, in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality of the Court struck down a system in which only a limited range of mitigating circumstances could be considered by the jury. The plurality held that "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death." 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis original). In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), a majority of the Court adopted the *Lockett* rule. *Johnson,* —— U.S. at ——, 113 S.Ct. at 2665.

In *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Court held that the Texas capital punishment scheme did not allow for sufficient consideration of the defendant's mitigating evidence. The Texas death penalty statute implicated in *Penry* required the jury to answer three "special issues":

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

492 U.S. at 310, 109 S.Ct. at 2942. If the answer to these three questions was yes, the trial court was required to impose a death sentence. Otherwise, the defendant would be sentenced to life imprisonment. The petitioner in *Penry* had presented evidence of his mental retardation and childhood abuse. He argued that the jury instructions, which simply explained the burden of proof and that the jury could consider all evidence submitted during the guilt and penalty phase in answering the three questions, did not sufficiently provide for consideration by the jury of his mental retardation and childhood abuse as mitigating circumstances. The Court agreed and vacated the death sentence. *Id.* at 318–329, 109 S.Ct. at 2947–52.

Although the decision in *Penry* might have been viewed as breaking new ground in death penalty jurisprudence, the Court has since made it clear that *Penry* was not establishing a new rule,[15] but rather applying the existing precedent of *Jurek, Lockett,* and *Eddings. Penry,* 492 U.S. at 313–318, 109 S.Ct. at 2944–46; *Johnson,* —— U.S. at —— ——, 113 S.Ct. at 2667–68. The Court's ruling in *Johnson* strongly suggests that the *Penry* rationale would not extend to Wright's situation.

In *Johnson,* the Court rejected the contention that the same Texas capital punishment scheme implicated in *Penry* did not adequately permit for consideration of the defendant's age as a mitigating factor.[16] The facts of *Johnson* are similar to those of this case. The defendant, Johnson, was 19 years old at the time he murdered a convenience store clerk during the course of a robbery. He was convicted of capital murder and sentenced to death. It was undisputed that "a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of *Lockett* and *Eddings.*" —— U.S. at ——,

---

15. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (new rule of constitutional law will generally not be applied in habeas corpus proceedings).

16. In *Graham v. Collins,* —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), the Court declined to reach the merits of a similar challenge to the Texas scheme on habeas review under the *Teague* doctrine. *See, supra,* note 15.

113 S.Ct. at 2668. Johnson argued that narrow limits of the Texas "special issues" did not allow adequate consideration of his youth by the jury.

The *Johnson* Court held that the second special issue—whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society—coupled with the trial court's instruction to the jury that it could consider all mitigating evidence presented during the guilt and penalty phase of the trial in answering the special issues, adequately permitted the jury to give mitigating effect to Johnson's age. *Id.* at ——, 113 S.Ct. at 2669. The Court recounted the testimony of Johnson's father that his son's actions were due in large part to his youth as further evidence that Johnson's age and its mitigating effect was within the jury's reach.

> It strains credulity to suppose that the jury would have viewed the evidence of petitioner's youth as outside its effective reach in answering the second special issue. The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. We believe that there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination. As we recognized in *Graham*, the fact that a juror might view the evidence of youth as aggravating, as opposed to miti-

gating, does not mean that the rule of *Lockett* is violated. As long as the mitigating evidence is within the effective reach of the sentencer, the requirements of the Eighth Amendment are satisfied.

*Id.* at ——, 113 S.Ct. at 2669 (citations and quotation marks omitted). Thus, the Court rejected the argument that Johnson was entitled to a special instruction regarding the mitigating effect of his age.

This review of the relevant Supreme Court decisions, especially *Johnson*, compels the conclusion that Wright's constitutional challenge must fail.[17] It is undisputed that the jury knew Wright's age at the time of the crime and his family background. Wright's argument is that the knowledge alone was not enough because the jury was not told that it could consider these facts to be mitigating circumstances. Clearly, this argument is foreclosed by *Johnson*.[18] Moreover, under Delaware law, the jury acts only in an advisory capacity while the trial judge is vested with the ultimate responsibility of determining whether the statutory prerequisites to imposition of the death penalty have been fulfilled. Since the trial judge explicitly considered Wright's age as a mitigating circumstance in her sentencing decision, it cannot be suggested that that mitigating evidence was not "within the effective reach of the sentencer." *Id.* We are mindful of the fact that a constitutional defect in the jury instructions would require the death sentence to be vacated, notwithstanding the fact that the trial judge is vested with the ulti-

---

17. The Delaware capital punishment system is significantly broader than the Texas scheme upheld in *Johnson* and other cases with respect to the consideration of mitigating circumstances. Delaware's law explicitly requires both the jury and judge to weigh all relevant aggravating and mitigating circumstances and determine that the aggravating outweigh the mitigating in order to impose a death sentence. 11 *Del.C.* § 4209(c)(3)a.2. The Texas statute is entirely focused on the three special issues, within which any mitigating evidence is to be considered. Since Delaware law explicitly permits consideration of any mitigating evidence without the constraint of the Texas special issues format, this case does not turn on *Johnson*.

18. Wright's reliance on *Sanders v. State*, Del. Supr., 585 A.2d 117 (1990), is misplaced. In

*Sanders*, the jury found the defendant guilty but mentally ill of First Degree Murder and sentenced him to death. We vacated the death sentence, holding that, in order for the jury to properly perform its sentencing function, special jury instructions were required to explain the significance of the guilty but mentally ill verdict, which establishes a mitigating circumstance *as a matter of law*. *Id.* at 134. The law has long held the mentally ill to a different set of standards and that tradition was the underlying rationale of the *Sanders* decision. *See id.* at 136–38. We see no reason to extend *Sanders* beyond its extraordinary facts. Indeed, this is consistent with the Supreme Court's refusal to extend *Penry* to reach the facts of *Johnson*. *See Johnson*, —— U.S. at ————, 113 S.Ct. at 2669–70.

mate responsibility for imposition of a death sentence. *See Espinosa v. Florida,* —— U.S. ——, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). Application of that rule is not required, however, where, as here, the defendant's age was subject to consideration by those responsible for determining his sentence, both jury and judge, as evidenced by the court's explicit reference. Finally, we decline Wright's invitation to interpret Article I, Section 11 of the Delaware Constitution (forbidding cruel punishments) or 11 *Del.C.* § 4209(c)(3)a (requiring the judge to give "appropriate instructions" to the jury) as requiring special jury instructions regarding the mitigating effect of age and family background. *See State v. Cohen,* Del.Supr., 604 A.2d 846, 850 (1992) (Delaware Constitution provides no greater protection against punishment than does the United States Constitution). Accordingly, we find no error, let alone plain error, in the challenged jury instructions.

## III

Wright contends that the trial judge erred in her determination of non-statutory aggravating circumstances and mitigating circumstances. We review this contention in connection with our statutorily mandated review, 11 *Del.C.* § 4209(g), since the result of such error, as Wright argues, is that "the death penalty was either arbitrarily or capriciously imposed." 11 *Del.C.* § 4209(g)(2)(a). Additionally, Wright argues that imposition of the death penalty was "disproportionate" to the penalty imposed in similar cases. *See id.* This contention is also addressed in connection with our statutorily mandated review.

The Delaware capital punishment statute requires this Court's review of Wright's death sentence. 11 *Del.C.* § 4209(g). Although the review mandated by the statute is limited, that review is not perfunctory. *Red Dog v. State,* Del.Supr., 616 A.2d 298, 306 (1992). 11 *Del.C.* § 4209(g)(2) provides as follows:

(2) The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

This Court performs its mandatory review fully cognizant of the solemn reality that "death as a punishment is unique in its severity and irrevocability." *Pennell v. State,* Del. Supr., 604 A.2d 1368, 1375 (1992) (citing *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)).

This Court has traditionally commenced its mandatory statutory review by initially addressing subparagraph (b) of Section 4209(g)(2). *Pennell v. State,* 604 A.2d at 1375. That subsection requires this Court to examine the evidence in the record to determine whether it supports the findings of the Superior Court judge which relate to the establishment of statutory aggravating circumstances. 11 *Del.C.* § 4209(e). Thereafter, two additional inquires are required by subparagraph (a) of Section 4209(g)(2): first, whether the Superior Court judge's imposition of the death penalty was either arbitrary or capricious; and second, whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under this statute. *Pennell v. State,* 604 A.2d at 1375; *Riley v. State,* Del.Supr., 496 A.2d 997, 1026 (1985). "Each question requires a consideration of the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender." 11 *Del.C.* § 4209(g)(2); *Pennell v. State,* 604 A.2d at 1375.

*Red Dog v. State,* 616 A.2d at 306–07.

### A.

■ At the penalty hearing, the State argued that the evidence established two statu-

tory aggravating circumstances: (1) "The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, unlawful sexual intercourse, arson, kidnapping, robbery, sodomy or burglary." 11 *Del.C.* § 4209(e)(1)(j); (2) "The victim was 62 years of age or older." 11 *Del.C.* § 4209(e)(1)(r). Since Wright was convicted of murder in the course of committing the felony of robbery, the first statutory aggravating circumstance was established by the jury's finding in the guilt phase. It was undisputed that the victim was over 62 years of age, as the jury unanimously determined and the Superior Court judge agreed. We thus conclude that the record supports the Superior Court's finding that the State has established, beyond a reasonable doubt, the existence of two statutory aggravating circumstances. 11 *Del.C.* § 4209(e), (g)(2)(b).

■ At the penalty hearing, the State presented evidence that it claimed supported the existence of several non-statutory aggravating circumstances. In its written sentencing decision, the Superior Court found that the State had established three non-statutory aggravating circumstances which were relevant to the commission of the offense and Wright's character and propensities. The first was Wright's occupation as a dealer in illegal drugs. By his own testimony, Wright had been a drug-dealer since he was in the 7th grade. His mother testified that business was so lucrative that on one occasion he had up to $75,000 in a shoe box in his room. This highly unusual testimony was presented by Wright to support his argument that he had ample money and thus would not be involved in a robbery where the proceeds were estimated to be $30. The record clearly supports the trial judge's finding of a non-statutory aggravating circumstance due to Wright's admission to a life of drug-dealing.

■ A second non-statutory aggravating circumstance found by the trial court and described in its sentencing decision related to circumstances surrounding the murder/robbery:

According to the defendant, he and Lorinzo Dixon were high on illegal drugs. The victim was an unarmed man working alone in a liquor store. He was disabled as he had suffered an above-the-knee amputation as a teenager. The crime, as described by the defendant—a description which the jury clearly accepted as true, which comports with the physical evidence, and which is consistent with the testimony that the victim was not a man to surrender the cash in his register, even at gun point—occurred when the defendant and Dixon entered the Hi–Way Inn, demanded cash, were denied the cash by the victim who then reached across to the left with his right hand, apparently to unplug the cash register, and was shot in the back of the head. The defendant admits on the videotaped confession to firing the gun one time, under threat from Dixon. Mr. Seifert was shot three times. The wound which the defendant admits inflicting and describes on the videotape was a mortal wound, according to the Medical Examiner. The testimony at trial from an eye-witness who saw two black men flee from the murder scene, was that the two men exited, then one went back in and then fled. He said the shorter of the two men went back in. It was very clear from the testimony of Mr. Seifert's co-worker who was in an adjoining room, that there was one shot, a brief passage of time, then two more shots. The defendant is shorter than Lorinzo Dixon. Dixon has pled guilty to the charges of Robbery First Degree and Possession of a Deadly Weapon During the Commission of a Felony. The compelling conclusion is that the defendant was the one who returned to inflict the final shots.

We have carefully reviewed the record and it clearly supports this version of the events of January 14, 1991, which the Superior Court described as an "unprovoked, cold-blooded, murder of a person who lacked the ability to defend himself, solely for pecuniary gain." We find no error in the Superior Court's determination of a second non-statutory aggravating circumstance.[19]

---

19. Wright claims the Superior Court erred by considering the fact that he was "high on illegal

■ The third non-statutory aggravating circumstance found by the Superior Court was the shooting of Emil Watson. Watson, a young boy who was riding his bicycle in the Riverside area where Wright resided, was shot during the afternoon of November 15, 1990. Wright was shooting a gun at a vacant house when Watson rode into the line of fire and was struck in the foot. Watson refused to cooperate with police, and there is evidence in the record that he was paid a large sum of money by Wright for his non-cooperation. Wright was arrested during the raid on his residence and indicted for assault as a result of the incident. After receiving his *Miranda* warnings, Wright confessed to the shooting. During the penalty hearing, the prosecutor argued to the jury that the shooting demonstrated that Wright had an "absolute disregard for anyone's safety." Wright had not been tried on the assault charge at the time of the penalty hearing and the State subsequently nolle prossed the charge because of these convictions.

Wright challenges the validity of considering a crime for which he was not convicted as a non-statutory aggravating circumstance. Since one statutory aggravating factor refers to criminal *convictions*, see 11 *Del.C.* § 4209(e)(1)(i), and records of criminal *convictions* are admissible during the penalty phase hearing, 11 *Del.C.* § 4209(c)(1), Wright argues that we must presume that the legislature did not intend that arrests or other accusations of criminal conduct not resulting in criminal convictions be considered as non-statutory aggravating circumstances. We find this argument unpersuasive.

The death penalty statute expressly permits consideration of "any aggravating circumstance, including, but not limited to, those aggravating circumstances enumerated in subsection (e) of this section." 11 *Del.C.* § 4209(c)(1). This provision is clearly constitutional. *See Gregg v. Georgia*, 428 U.S. 153, 206, 96 S.Ct. 2909, 2941, 49 L.Ed.2d 859 (1976) ("the jury is permitted to consider any aggravating or mitigating circumstances"). Recently, we upheld a death sentence imposed, in part, upon evidence of the defendant's involvement in a prison murder even though he was not convicted of any crime arising out of the homicide. *Red Dog v. State*, 616 A.2d at 303, 308. The admitted shooting of Emil Watson in the middle of the afternoon in a crowded housing project, even though unintentional, was evidence of Wright's "complete disregard for anyone's safety" and properly considered as a non-statutory aggravating circumstance.[20]

The Superior Court carefully considered mitigating evidence presented by Wright for the purpose of determining the appropriateness of a life or death sentence. Those considerations were included in a written sentencing decision. The trial court considered Wright's age, 18 at the time of the murder, to be a mitigating circumstance. Further, the court observed that Wright had the support of his mother and sister and that he is the father of two children. His mother testified that he provided for the needs of his children. While not noted in the sentencing decision, Wright's mother also testified that Wright had grown up living in the Riverside housing project, that he did not have a father figure in the home, and that his father was incarcerated for drug-related offenses at the time of the penalty hearing.

drugs" at the time of the offense as a non-statutory aggravating circumstance. *Cf. Red Dog v. State*, 616 A.2d at 309 n. 14 (long history of drug or alcohol abuse may be considered as a mitigating circumstance). Wright misreads the record. It is clear from the quoted passage that Wright's drug use was mentioned as background information in the Superior Court's description of the events leading up to "an unprovoked, cold-blooded, murder of a person who lacked the ability to defend himself, solely for pecuniary gain," which the court deemed to be a non-statutory aggravating circumstance.

Since the trial court did not consider Wright's drug use as a non-statutory aggravating circum-

stance, we need not consider whether it would have been permissible to do so, and therefore decline the State's invitation to address the issue.

20. Wright's reliance on *Provence v. State*, Fla. Supr., 337 So.2d 783 (1976), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977) and *Dragovich v. State*, Fla.Supr., 492 So.2d 350 (1986) is misplaced. Unlike Delaware's death penalty statute, the Florida statute implicated in those cases "prohibits consideration of nonstatutory aggravating circumstances." *Barclay v. Florida*, 463 U.S. 939, 956, 103 S.Ct. 3418, 3428, 77 L.Ed.2d 1134 (1983).

Wright claims that the Superior Court erred as a matter of law in failing to consider the disposition of the charges against his co-defendant Lorinzo Dixon as a mitigating circumstance. This claim is frivolous. The trial judge specifically noted the disposition of the charges against Dixon in her decision. *See, supra*, page 340. Further, the evidence strongly suggested, if not conclusively proved, that Wright was the sole triggerman. Therefore, there was no reason to consider the disposition of his co-defendant's charges as a mitigating circumstance. *Cf. Riley v. State*, 585 A.2d at 730 (fact that co-defendant, *who was the actual killer*, received lesser penalty as a result of a plea-bargain considered to be mitigating evidence).

■ The Superior Court expressed the basis for its decision to sentence Wright to death in a thoughtful 12 page opinion. Because the penalty hearing was "extremely brief," the trial judge ordered a presentence investigation. After reviewing the presentence report, including Wright's numerous arrests, the Superior Court concluded its sentencing analysis by stating:

> During the three month period the defendant was on the street after reaching the age of majority, his life was an evolving pattern of violence.

> The presentence report did not develop any new mitigating factors. The defendant expresses no remorse for the death of Philip Seifert. He continues to maintain his innocence.

> The evidence in this case as supplemented by the facts presented in the presentence report reflects that the weight of the statutory and non-statutory aggravating circumstances completely overwhelm the mitigating circumstances.

The trial judge carefully considered the totality of the evidence in aggravation and mitigation, which related to the particular circumstances of Philip Seifert's murder and Wright's character and propensities. 11 *Del.C.* § 4209(g)(2)(a). The record reflects that the Superior Court's decision to impose the death sentence was the product of a deliberate, rational and logical deductive process. *Red Dog v. State*, 616 A.2d at 310. After a careful review of the entire record, this Court concludes that the sentence of death was imposed upon Wright neither arbitrarily nor capriciously.

### B.

11 *Del.C.* § 4209(g)(2)(a) requires that we review Wright's sentence to determine if it is "disproportionate to the penalty recommended or imposed in similar cases arising under this section." In making this determination, this Court has reviewed the "universe" of cases, which is comprised of those First Degree Murder cases since 1985 which have gone to a penalty hearing and where the sentence has become final, either without or following review by this Court. *Red Dog v. State*, 616 A.2d at 311. (Appendix A). [21] A definitive comparison of the universe of cases is almost impossible. *Id.; Pennell v. State*, 604 A.2d at 1376. Nevertheless, we have compared Wright's sentence with those imposed in all First Degree Murder cases which have gone to a death penalty hearing. We have also considered objective evidence such as the gravity and circumstances of Wright's crime, and the harshness of the penalty. *Red Dog*, 616 A.2d at 311 (citing *Solem v. Helm*, 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983)).

■ Wright argues that his sentence is disproportionate to those imposed in similar cases. He cites several cases in which a murder was committed during the course of a robbery and the jury recommended a life sentence. *See, e.g., Flamer v. State*, Del. Supr., 490 A.2d 104, 140–43 (1983) (reviewing cases). Wright also observes that within the universe of cases a life sentence has been imposed more frequently than the death penalty. However, as the Supreme Court has observed, sentencing decisions involve "diffi-

---

**21.** Since the revision of the death penalty procedure in 1991, the jury's determination is no longer conclusive. However, pre–1991 death penalty cases involving jury determination are nevertheless pertinent to the proportionality determination since those cases do reflect a jury consensus on the appropriateness of imposing the death penalty. More importantly, in all cases in which the death sentence was imposed, this Court conducted proportionality review.

cult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system." *McCleskey v. Kemp,* 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987) (citation and quotation marks omitted). As a result of those human judgments, "disparities in sentencing are an inevitable part of our criminal justice system." *Id.* at 312, 107 S.Ct. at 17. Accordingly, a statistical analysis comparing life versus death sentences according to the nature of the crime (or, as in *McCleskey,* races of the victim and defendant), is neither reliable nor required. *See id.* at 319, 107 S.Ct. at 1778. Instead, we must look to the facts of the case before us and determine whether Wright's sentence was proportionate to the penalty imposed in other cases within the universe of cases. *See Red Dog,* 616 A.2d at 311; *Dawson v. State,* Del.Supr., 581 A.2d 1078, 1108–09 (1990), *judgment vacated on other grounds,* —— U.S. ——, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).

■ Our careful examination of this case and those within the universe of cases reveals that Wright, like others sentenced to death in Delaware, committed an unprovoked, cold-blooded, murder of a person who lacked the ability to defend himself, solely for pecuniary gain. *DeShields v. State,* Del. Supr., 534 A.2d 630, 649 (1987); *Riley v. State,* 496 A.2d at 1027. As the Superior Court described in its sentencing decision, Philip Seifert's murder was cruel and senseless. We conclude that Wright's sentence of death for the murder of Philip Seifert was proportionate when compared with the sentences imposed in Delaware's universe of cases.

### IV

■ In *State v. Cohen,* Del.Supr., 604 A.2d 846 (1992), we held that application of the revised 1991 death penalty statute to this case did not violate the *Ex Post Facto* Clause of the United States Constitution. Wright was a named defendant in the *Cohen* consolidated certification proceeding. In this appeal, Wright renews his *ex post facto* challenge. In *Red Dog v. State,* 616 A.2d at 305–06, an identical challenge was made on behalf of another of the named defendants. There, we stated:

> The unanimous *en banc* opinion of this Court, answering the questions of law certified to it by the Superior Court while [the defendant] was awaiting trial, constitutes the law of the case in the matter *sub judice.* As the law of the case, this Court's prior rulings must stand *unless* those rulings were *clearly in error* or there has been an important change in circumstances. [The defendant] has cited no intervening changes in the law or circumstance since the questions certified in his case were answered by this Court.... We remain convinced that this Court's rejection of identical *ex post facto* challenges, to the applicability of the revised death penalty statute in [this] case, was correct. Therefore, we conclude that [the defendant's] renewed *ex post facto* argument is without merit.

(citations and quotation marks omitted). We adhere to our decisions in *Cohen* and *Red Dog* and reject Wright's *ex post facto* challenge.

### V

This Court has considered and rejected the claims of error alleged by Wright. We conclude that the death sentence imposed upon Wright for the murder of Philip Seifert was imposed neither arbitrarily nor capriciously and is not comparatively disproportionate to the sentences imposed in other First Degree Murder cases that have proceeded to a penalty hearing pursuant to the Delaware capital punishment statute. 11 *Del.C.* § 4209(g)(2)(a); *Red Dog,* 616 A.2d at 312. We also conclude that the evidence supports the Superior Court judge's finding of two statutory aggravating circumstances as enumerated in 11 *Del.C.* § 4209(e). 11 *Del.C.* § 4209(g)(2)(b). Accordingly, the judgments of the Superior Court, finding Wright guilty of all charges and sentencing him to death for the murder of Philip Seifert, are AFFIRMED.

This matter is remanded to the Superior Court for further proceedings consistent with

this opinion, including the setting of a new date of execution. This Court's order of October 26, 1992, staying the execution of Wright's sentence, shall terminate upon the issuance of this Court's mandate.

## APPENDIX A

### FIRST DEGREE MURDER CASES THAT WENT TO PENALTY HEARINGS

#### 1985 to date

Appendix I to *Red Dog v. State*, Del.Supr., 616 A.2d 298, 312–15 (1992) is incorporated herein by reference, subject to the following changes and additions.

Case Name: David F. Dawson *
Case No.: IK86–0024; IK87–01–0841, 0843, 0845
County: New Castle (venue changed)
Sentence: Death—automatic appeal pending
Case Name: Cornelius E. Ferguson *
Case No.: IN91–10–0576, 0578 thru 0581
County: New Castle
Sentence: Death—automatic appeal pending
Case Name: Arthur Govan
Case No.: 92–01–0166
County: New Castle
Sentence: Life Imprisonment
Case Name: Robert W. Jackson, III *
Case No.: IN–92–04–1222 thru 1227; IN92–04–1348 and 1349
County: New Castle
Sentence: Death—automatic appeal pending
Case Name: David J. Lawrie *
Case No.: IK92–08–0179 thru 0185; IK92–09–0148 and 0149
County: Kent
Sentence: Death—automatic appeal pending
Case Name: Frank W. Moore, Jr.
Case No.: 92–09–0001, 0002, 1001, 2001, 3001
County: Sussex
Sentence: Life Imprisonment
Case Name: Jack F. Outten *
Case No.: IN92–01–1144 and 1145
County: New Castle
Sentence: Death—automatic appeal pending

Case Name: James W. Perez
Case No.: IN–93–02–1191 and 1197
County: New Castle
Sentence: Life Imprisonment
Case Name: James Allen Red Dog
Case No.: IN91–02–1495 to 1503
County: New Castle
Sentence: Death
Case Name: Nelson W. Shelton *
Case No.: IN–92–01–1154 and 1155
County: New Castle
Sentence: Death—automatic appeal pending
Case Name: Steven W. Shelton *
Case No.: IN–92–01–1149 and 1150
County: New Castle
Sentence: Death—automatic appeal pending
Case Name: Donald J. Simmons
Case No.: IN92–01–0770 thru 0772; IN92–01–1140 and 1141
County: New Castle
Sentence: Life Imprisonment
Case Name: Willie G. Sullivan *
Case No.: IK–01–0192 thru 0196; IK92–02–0001; IK92–03–0022
County: Kent
Sentence: Death—automatic appeal pending
Case Name: Charles H. Trowbridge
Case No.: IK–91–07–0175, IK–91–09–0032 thru 0034
County: Kent
Sentence: Life Imprisonment
Case Name: John E. Watson
Case No.: IN–91–09–0020 thru 0025
County: New Castle
Sentence: Life Imprisonment
Case Name: Dwayne Weeks *
Case No.: 92–01–0167
County: New Castle
Sentence: Death—automatic appeal pending
Case Name: Jermaine M. Wright *
Case No.: IN91–04–1047 thru 1953
County: New Castle
Sentence: Death—present proceeding

The "universe" of cases is comprised of those First Degree Murder cases which have gone to a penalty hearing and where the sentence has become final, either without or

following a review by this Court. An asterisk marks those capital murder cases which are not included in the defined "universe" of cases.