Jack Foster OUTTEN, Jr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Steven W. SHELTON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 159, 1993, 163, 1993, 164,
1993 and 166, 1993.

Supreme Court of Delaware.

Submitted: Sept. 20, 1994.
Decided: Nov. 21, 1994.
Revised: Dec. 23, 1994.

Anthony A. Figliola (argued), Figliola & Facciolo and Sheryl Rush–Milstead, Wilmington, for appellant Outten.

Joseph A. Gabay (argued), Wilmington, for appellant Shelton.

Richard E. Fairbanks, Jr. (argued), for appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ.

VEASEY, Chief Justice.

In this appeal, we consider the sentences of death imposed on April 30, 1993, by the Superior Court on defendants below-appellants Jack Outten ("Outten") and Steven Shelton ("Steven")[1] for the first degree felony murder of Wilson Mannon ("Mannon"). Steven's principal grounds for overturning his sentence are as follow: (a) the State negligently failed to secure and preserve a washing machine top allegedly used in the murder; (b) the Superior Court erred by not finding Christina Gibbons ("Gibbons") to be an incompetent witness; (c) the Superior Court erred by failing to instruct the jury regarding the burden of proof for non-statutory aggravating circumstances; (d) the Superior Court erred by excluding the testimony of Anthony Borsello ("Borsello"); (e) the Superior Court erred by failing to sever the trials; and (f) the State's peremptory challenge of a certain venire member violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1976). Outten joined in Steven's last two contentions and also maintained that the Superior Court erred by not permitting Outten to introduce extrinsic evidence in support of the credibility of one of his witnesses. Further, 11 *Del.C.* § 4209(g) requires this Court to review both death

sentences to ensure the sentences were proportional to sentences received in similar crimes under that section. After reviewing the record and the applicable authorities, we find that the Superior Court committed no error. Accordingly, we **AFFIRM** the sentences imposed by the Superior Court.

## I. FACTS

Outten, Steven, Nelson and Nelson's girlfriend, Gibbons, spent the afternoon of January 11, 1992 drinking beer at Nelson and Gibbons' home in Newark, Delaware. After drinking approximately one and one-half cases of beer, the four drove to Clemente's Tavern. At Clemente's, Outten conversed with another patron and indicated that he would sell drugs to the patron. Outten left Clemente's with the patron and proceeded to rob the patron of $25. He then rejoined Steven, Nelson and Gibbons and left for another bar.

Outten, Steven, Nelson and Gibbons proceeded to Hamill's Pub in Elsmere, and then to Fat Boys Bar in New Castle. Upon arrival, the three men began playing pool and Gibbons sat at the bar counter. Gibbons eventually began conversing and drinking with Mannon, who had arrived at Fat Boys earlier that same day. Ultimately, Mannon left the bar with Gibbons and the three men.

Mannon's body was discovered along a road in a deserted area of East Wilmington at approximately 11:00 a.m. on January 12, 1992. Mannon was lying on his back with his legs crossed and the top of his head completely shattered. His pockets were turned inside-out, and loose change, his empty wallet and his identification cards were scattered nearby. Additionally, a broken hammer handle rested a few feet away from Mannon's body and the hammer head sat near a fence along the road.

---

1. A third defendant, Nelson Shelton ("Nelson"), Steven Shelton's brother, was tried jointly in Superior Court with Steven and Outten. All three were convicted and sentenced to death. Nelson's appeal has been severed from the appeals of Steven and Outten. Nelson is currently proceeding pro se with his appeal in *Nelson Shelton v. State of Delaware*, Del.Supr., 645 A.2d 569 (1994). *See* Orders of this Court dated

March 4, 1994 and April 19, 1994 with regard to his representation on appeal and related issues. The briefing of the Nelson appeal was stayed by Order of this Court dated June 8, 1994, and the stay was lifted by Order dated September 20, 1994, the date on which oral argument was held in the appeals in the instant cases. Oral argument in Nelson's appeal was held in this Court on December 15, 1994.

New Castle police questioned Nelson and Gibbons later on the morning of January 12 regarding an unrelated matter. During questioning, Gibbons told the police that Outten had killed an old man named "Willie" by hitting him with a sink,[2] that Steven had kicked the old man and that Nelson, though present, had not become involved. In another statement that day, Gibbons stated that Outten had also beaten Mannon and hit him with a hammer before using "the sink." Nelson admitted that he swung a hammer at Mannon.

Outten, Nelson and Steven were tried together in a joint trial in the Superior Court. There was no timely motion for severance filed. The State introduced considerable scientific evidence linking all three of the defendants to the crime, including traces of the victim's blood on the defendants' clothing. The State's principal eyewitness was Gibbons, who initially testified at trial that Steven did not participate in the killing, but later admitted that she had lied and that all three defendants had been involved in Mannon's murder.

The trial court excluded the testimony of Borsello offered in defense by Steven. Borsello was an inmate at the Gander Hill correctional facility, occupying the cell next to Outten. Outten allegedly told Borsello that Outten and Nelson had killed Mannon, and that Steven and Gibbons "were over by the car" and were not involved in the killing. Borsello admitted that he engaged in the conversation with Outten at the behest of Captain Huston, a police officer involved in the investigation.

At the conclusion of the trial, the jury found all three defendants guilty of first degree felony murder and related offenses. In a separate penalty hearing, the jury recommended that all three defendants be sentenced to death.[3] The Superior Court accepted this recommendation and sentenced each defendant to death. Both Outten and Steven appealed their convictions, and an automatic appeal was docketed as to their sentences.[4]

## II. STEVEN SHELTON'S APPEAL

### A. Whether the Washing Machine Top was Negligently Secured and Preserved

■ Steven's first contention on appeal is that the State negligently failed to secure and preserve the washing machine top allegedly used in Mannon's murder. Accordingly, Steven claims that the Superior Court should have entered a *Lolly* instruction negating any inference that the washing machine top was inculpatory.[5]

2. Originally, Gibbons told police that Outten used a sink to kill Mannon, but later Gibbons admitted that the actual instrument might have been a washing machine top.

3. The court instructed the jury:

 While the Court has the ultimate responsibility for imposing sentence on the defendant, your role as jurors in the sentencing procedure is, nevertheless, both extremely vital and important. Further, the fact that your recommendation in this case does not have to be unanimous should not influence you to act hastily or without due regard to the importance of these proceedings. You will provide the Court as the conscience of the community with an advisory opinion on what the jury believes the evidence has shown with regard to the appropriate penalty in this case as to each defendant. You must not take this responsibility lightly. Although the Court is not bound by your recommendation, your recommended answers to the questions provided will be given great weight by the Court in its final determi-

nation of the appropriate sentence as to each defendant.

\* \* \* \* \* \*

 I want to emphasize that even if you do find the existence of a statutory aggravating circumstance, you nevertheless may conclude, based upon a preponderance of the evidence, that the mitigating circumstances found to exist outweigh the aggravating circumstances found to exist.

Penalty Hearing Jury Instructions at 2–3 and 7. The jury voted 7–5 to sentence Outten to death, voted 8–4 to sentence Steven to death, and 8–4 to sentence Nelson to death.

4. *See* footnote 1 with regard to Nelson's appeal.

5. Pursuant to this Court's opinion in *Lolly v. State*, Del.Supr., 611 A.2d 956 (1992), if police negligently fail to preserve exculpatory evidence in a criminal investigation, the defendant is entitled to an instruction "which accords him a favorable inference based on the missing evidence." *Id.* at 962.

During her initial statements to the police on January 12–13, 1992, Gibbons maintained that the murder weapon was a "sink." Although Gibbons claimed that the "sink" was thrown into a ditch along Interstate 95, she could not locate the object described when police took her to the area she indicated. In fact, the record shows that during the search, the police pointed out the washing machine top to Gibbons, but she replied that it "probably" was not the murder weapon. The police continued to do a thorough search, but could not find the "sink."

The police were not informed that the washing machine top might have been the weapon until Nelson's counsel asked the police to obtain the washing machine top on March 30, 1992, almost three full months after the murder. Steven has not demonstrated that the actions of the police were negligent. *See Hammond v. State,* Del. Supr., 569 A.2d 81 (1989). The evidence showed that the police proceeded carefully and wholly within the law based on the information available. As soon as the police were aware of the possibility that the washing machine top may have been used in the murder they seized it. Even had they seized it immediately, it is unlikely the washing machine top would have yielded any new evidence. It had sat submerged in water for at least 24 hours prior to the initial discovery of it by the police. This fact would have seriously impaired the ability of the police to remove significant fingerprints, hair, or blood. Further, Gibbons testified that Outten, and not Steven, hit Mannon with the washing machine top. Therefore, even had the police pulled the washing machine top out of the ditch immediately upon discovery and not found Steven's fingerprints on the top, this would not point to Steven's innocence. Accordingly, the police actions were justified and the Superior Court did not err by refusing to find that the police acted negligently.

## B. Whether Gibbons was an Incompetent Witness

■ During the later stages of the trial, Gibbons testified that she had perjured herself in her earlier testimony. Gibbons stated, "I have been lying so much for this trial, I really don't know what the truth is anymore." Steven claims that the trial court erred by not striking Gibbons' testimony, or declaring a mistrial after this admission. Steven asserts that Gibbons was an incompetent witness who did not feel an obligation to tell the truth. He relies generally on *State v. Keys,* Supr., 114 N.H. 487, 322 A.2d 615 (1974), for the proposition that when a trial court is not satisfied that a witness feels obligated to testify truthfully, that witness should be disqualified or her testimony stricken.

Delaware Rules of Evidence provide that anyone is competent to testify as a witness, except as otherwise provided in the Rules of Evidence. D.R.E. 601; *see also Ricketts v. State,* Del.Supr., 488 A.2d 856, 857 (1985) ("[A]lmost anyone is competent to testify, letting the concerns of mental or moral capacity go to the issues of credibility or weight given to the evidence"). Each witness, however, must declare prior to testifying that he or she will testify truthfully. D.R.E. 603.

Although Gibbons' testimony was, at best, inconsistent and arguably runs afoul of D.R.E. 603, it does not rise to the level at which her testimony must be stricken. First, although a portion of the record reveals that Gibbons lied and knew she lied, the rest of the record amply supports a finding that Gibbons did understand the importance of her oath to tell the truth. Second, this Court in *Conlow v. State,* Del.Supr., 441 A.2d 638, 640 (1982), stated that the jury, not the court, is best suited to resolve the conflicts presented by a witness who changes his or her testimony. One treatise observes:

> Although a witness at a criminal trial admits lying at three other criminal trials and has not been and does not expect to be prosecuted for perjury, it does not follow that he is an incompetent witness; the credibility of the witness may be tested by cross-examination and the credibility of his testimony is to be determined by a properly instructed jury.

81 AM.JUR.2d *Witnesses* § 165, at 180. Steven had ample opportunity to cross-examine Gibbons and discredit her testimony before the jury. Nonetheless, the jury obviously

believed Gibbons' testimony and convicted Steven. Completely striking Gibbons' testimony would have been excessive, and the trial court's decision not to declare a mistrial was not an abuse of discretion.

### C. Whether the Superior Court Erred by Failing to Instruct the Jury about the Burden of Proof for Non-statutory Aggravating Circumstances

■ At the conclusion of the penalty hearing, the trial court instructed the jury that statutory aggravating circumstances had to be established beyond a reasonable doubt, but did not specify the burden of proof for non-statutory aggravating or mitigating circumstances. Steven relies on this Court's decision in *State v. Cohen*, Del.Supr., 604 A.2d 846 (1992), in claiming that the trial court erred by failing to instruct the jury about non-statutory aggravating circumstances. This Court stated in *Cohen*, that "each aggravating factor [must] be proven beyond a reasonable doubt followed by a weighing of such factors against those in mitigation." *Id.* at 851. Steven's reliance on *Cohen* is misplaced.

The more recent case of *Dawson v. State*, Del.Supr., 637 A.2d 57 (1994) controls this issue. In *Dawson*, this Court held that "the Delaware death penalty statute does not require the State to present evidence establishing a *non-statutory* aggravating circumstance beyond a reasonable doubt before it may be 'found to exist.'" *Id.* at 64. Based on this Court's holding in *Dawson*, the Superior Court's instructions were not erroneous.

### D. Whether Borsello's Testimony was Properly Excluded

■ Steven claims that the trial court committed plain error in excluding Borsello's testimony. He asserts that, pursuant to D.R.E. 804(b)(3), the testimony qualified as a statement against interest and, therefore, should have been admitted. The State contends that, since Borsello's testimony was inherently unreliable and there were no clear indications of the statement's trustworthiness, the trial court correctly excluded the testimony.

D.R.E. 804(b)(3) allows admission of only truly reliable self-inculpatory statements made by unavailable declarants. The provision permits admission of the following:

> A statement which was, at the time of its making, so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless *corroborating circumstances clearly indicate the trustworthiness of the statement.*

D.R.E. 804(b)(3) (emphasis added). Moreover, "whether there is sufficient corroborative evidence to admit a hearsay statement against interest is a matter to be committed to the sound discretion of the trial court and reversible only upon a showing of abuse of discretion ... or that the ruling was clearly erroneous." *Ross v. State*, Del.Supr., 482 A.2d 727, 741 (1984) (citations omitted), *cert. denied*, 469 U.S. 1194, 105 S.Ct. 973, 83 L.Ed.2d 976 (1985).

Although this Court considered a similar issue in *Ross*, it has never fully developed what factors a court must consider when determining if "corroborating circumstances clearly indicate the trustworthiness of the statement." D.R.E. 804(b)(3). Therefore, it is helpful to consider federal interpretation of the federal counterpart of D.R.E. 804(b)(3). *See Smith v. State*, Del.Supr., 647 A.2d 1083, 1088 (1994). As set forth in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the general rule regarding the federal counterpart to D.R.E. 804(b)(3) is that courts must consider whether the statement (1) was made spontaneously and in close temporal proximity to the commission of the crime; (2) was corroborated by other evidence in the case; and (3) was truly self-incriminatory and against penal interest. The United States Supreme Court did not discuss whether a court may consider the witness' reliability, or other factors, when determining if corroborating circumstances clearly indicate trustworthiness.

The United States Court of Appeals for the Third Circuit has not definitively developed a uniform guideline for interpreting this issue. In *United States v. Atkins,* 3d Cir., 558 F.2d 133 (1977), the Third Circuit seemed to proscribe consideration of a witness' trustworthiness from the determination of the trustworthiness of a declarant's statement. In *Atkins,* the District Court excluded the testimony of a minor based on its conclusion that the witness was unreliable. The Court of Appeals reversed, reasoning that: (1) the court should have considered the trustworthiness of the declarant and not that of the witness; and (2) there were enough corroborating circumstances indicating the trustworthiness of the declarant's statement to admit the testimony. *Id.* at 135.

Subsequent decisions in the Third Circuit appear to have broadened the list of factors that a court may consider when making this determination. In *United States v. Bailey,* 3d Cir., 581 F.2d 341 (1978), the court held that:

> the trustworthiness of a statement should be analyzed by evaluating not only the facts corroborating the veracity of the statement, but also the circumstances in which the declarant made the statement and the incentive he had to speak truthfully or falsely. Further, consideration should be given to factors bearing on the reliability of the reporting of the hearsay by the witness.

*Id.* at 349; *see United States v. Boyce,* 3d Cir., 849 F.2d 833 (1988); *United States v. Green,* E.D.Pa., 694 F.Supp. 107 (1988), *aff'd,* 875 F.2d 312 (1989); *see also United States v. Alvarez,* 5th Cir., 584 F.2d 694, 701 (1978) ("trustworthiness is determined primarily by the probable veracity of the in-court witness, and the reliability of the out-of-court declarant").

The best way to harmonize these apparently conflicting decisions is by using the *dicta* set forth in *United States v. Satterfield,* 9th Cir., 572 F.2d 687, *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978). *Satterfield* dealt with a trial court's exclusion of a statement against interest due to the court's finding that the witness was not trust-

worthy. *Id.* The United States Court of Appeals for the Ninth Circuit ultimately upheld the exclusion for other reasons, but noted that "Rule [804(b)(3)] refers to the trustworthiness of the statement, not of the declarant, and that formulation may be broad enough to put the trustworthiness of the witness as well as the declarant at issue." *Id.* at 692. Therefore, a trial court may rely to some degree on the trustworthiness of the witness when deciding whether to admit a D.R.E. 804(b)(3) declaration. The court must be careful, however, to balance that consideration against the remaining elements in the total mix of *Chambers* factors.

Despite the trial court's confused interpretation of D.R.E. 804(b)(3) in the instant case, it properly excluded Borsello's testimony. Although the court discussed Borsello's trustworthiness at length, it also considered a host of other factors. The court found that, in addition to questions of Borsello's credibility, there were other indicia of the untrustworthiness of the statement. Outten did not confide in Borsello spontaneously, nor did he confide soon after the crime. Rather, Borsello admitted eliciting the statement from Outten almost eleven months after the crime, and then at the behest of a police investigator. Further, the physical evidence, as well as Gibbons' testimony, tended to show that both Outten and Shelton were involved in the murder. "Under Rule 804(b)(3), the corroborating circumstances must do more than tend to indicate the trustworthiness of the statement, they must *clearly* indicate it." *Satterfield,* 572 F.2d at 687. The trial court did not abuse its discretion in excluding the testimony because there were insufficient corroborating circumstances to indicate clearly the trustworthiness of the statement.

In any event, the portion of Borsello's testimony that related to Steven would have been excluded based on the reasoning set forth by this Court in *Smith v. State.* In *Smith,* the Court noted that "[t]he policy behind the declaration-against-interest exception is that self-inculpatory statements are inherently reliable and trustworthy. There is no clear policy basis, however, for attributing equal guarantees of trustworthi-

ness to declarations appurtenant to the self-incriminatory ones...." 647 A.2d at 1087 (citations omitted). "Non-self-incriminatory components of a declaration purportedly falling within D.R.E. 804(b)(3) are presumptively inadmissible hearsay because they cannot claim any special guarantees of reliability and trustworthiness." *Id.* at 1088.

Although the trial court's rationale was an imprecise interpretation of D.R.E. 804(b)(3), it nonetheless did not abuse its discretion by excluding Borsello's testimony.

## III. STEVEN AND OUTTEN

### A. Whether Severance was Required

■ Both Outten and Steven argue that their defenses, as developed at trial, were antagonistic and mandated severance. The Superior Court ruled, however, that the defenses were not.

"Severance is a matter within the sound discretion of the Trial Court," with "the defendant [having] the burden of demonstrating 'substantial injustice' and unfair prejudice," to prove necessity of severance. *Lampkins v. State,* Del.Supr., 465 A.2d 785, 794 (1983). Both Outten and Steven rely on this Court's decision in *Bradley v. State,* Del.Supr., 559 A.2d 1234 (1989), to prove necessity. In *Bradley* the Court held that the antagonistic defenses presented there mandated separate trials. This Court based its decision on the incompatible nature of each codefendant's case:

> In this case each defendant presented an alibi defense. Their two defenses as they unfolded in this case were so antagonistic that the jury could not accept one defendant's defense without rejecting a central part of the other defendant's defense. Moreover, throughout the trial, the jury was witness to repeated attempts by each defendant to incriminate the other. A fair trial is not possible under these circumstances, and a severance should have been granted.

*Id.* at 1241.

The Court, however, limited the application of *Bradley:*

Antagonistic defenses between codefendants is a fact to be considered when determining whether a severance should be granted. However, it is clear that the presence of hostility between a defendant and his codefendant or "mere inconsistencies in defenses or trial strategies" do not require a severance.

*Id.* (citation omitted) (quoting Annotation, *Antagonistic Defenses as Ground for Separate Trials of Codefendants in Criminal Case,* 82 A.L.R.3d § 2, at 250 (1978)).

In *Bradley* the defendants took the stand, presented contradicting and mutually exclusive alibis, and "introduced evidence that strongly implicated" one another. *Id.* There was no such antagonism in the instant case. Neither Outten nor Steven took the stand, nor presented evidence that implicated the other, except for Steven's offer of the Borsello testimony late in the trial.[6] The defendants' defenses were not mutually exclusive, and the jury easily could have found one defendant, both or neither defendant guilty. Neither defendant has met his burden of demonstrating substantial injustice and unfair prejudice requisite for showing the necessity of separate trials. Thus the Superior Court did not abuse its discretion by denying the motion to sever.

### B. Peremptory Challenge

■ During jury selection, Rodney Merriweather ("Merriweather"), an African-American venire member, responded to the State's questions concerning his views on the death penalty by stating that:

> [F]rom everything that I've read over the years, the death penalty is not applied fairly in a lot of circumstances and, that is, applies to race. It seems that either the judicial system or the jurors seem to unfairly apply the death penalty for some of the crimes.

Merriweather also informed the State that three of his family members had been murdered over the past ten years, and, in his

---

**6.** Outten claims that his defense was compromised by Steven's closing argument in which he attacked Outten. Although Steven's counsel did attack Outten, he did not cite any evidence implicating Outten in the killing, and thus this argument did not warrant a mistrial.

opinion, justice had not been served in these cases.

Based on Merriweather's responses, the State moved to strike Merriweather for cause; neither Outten nor Steven expressed any view. The trial judge denied the motion, noting that such a challenge would violate the equal protection clause of the Fourteenth Amendment of the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ("[A] defendant may establish a *prima facie* case of purposeful discrimination in the selection of the jury panel solely on evidence concerning the prosecutor's exercise of peremptory challenges ..."). The State then attempted to use a peremptory challenge to dismiss Merriweather. The Superior Court resisted the State's challenge, again citing *Batson.* At this point Outten's counsel stated, "We oppose any action by the Court not allowing the State to use their strike." Despite the trial judge's opinion that the peremptory challenge constituted a *Batson* violation, he nonetheless excused Merriweather and later stated that, by agreeing to the peremptory strike of Merriweather, all parties waived any *Batson* claims. Defendants argue that the existence of a *Batson* violation mandates the declaration of a mistrial, and, in the alternative, that the State's peremptory challenge violated *Del. Const.* art. I § 7.

■■■ The race of a potential juror cannot be the basis for the exercise of a peremptory challenge. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Equal Protection Clause prohibits race-based exclusion of jurors and guarantees the right of both the defendant, *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and the prosecutor, *Georgia v. McCollum,* — U.S. —, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), to object to purposeful racial discrimination in the use of a peremptory challenge. Regardless of the objector's race, the constitution requires that the exercise of peremptory challenges be race-neutral.

■■■ For a defendant to prove a *Batson* violation, he or she must establish a *prima facie* case by showing that the prosecutor has exercised peremptory challenges to disqualify persons from the petit jury solely on the basis of race. *Powers,* 499 U.S. at 406–09, 111 S.Ct. at 1368–70. One such way a defendant may do this is by showing that he and the prospective juror are of the same racial group. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723.

Neither Outten nor Steven has met this burden. Both are Caucasian while Merriweather is African–American. Even Outten's counsel notes the ineffectiveness of this argument:

> In the case at bar, Outten was Caucasian and the jurors removed by prosecution were black. Therefore, it is probable that any argument grounded in the 14th Amendment of the United States Constitution violation would not be successful.

Another possible way for the defendant to establish a *prima facie* case is by showing that the prosecution exhibited a systematic pattern of excluding prospective jurors of a certain racial group. Neither defendant has shown that the State exhibited such conduct. Although seven peremptory strikes had been used prior to the strike of Merriweather, Merriweather was the first African–American venire member struck by the State. Indeed, though in one instance the State found one minority juror acceptable, the defendants used one of their peremptory strikes to remove the prospective juror. Additionally, despite its *Batson* concerns, the trial court found that "there has been no pattern of use by the State of its peremptory charges—or challenges in connection with exclusion of black jurors. There is nothing here in this case to indicate that." The defendants have not established a *prima facie* case of a *Batson* violation.

■■■ Although the Superior Court incorrectly stated that the State's exclusion of Merriweather from the jury violated *Batson,* this error was harmless. The trial court ultimately upheld the State's peremptory challenge and permitted the State to strike Merriweather from the jury.

The defendants' Delaware State Constitution argument is equally without merit. *Riley v. State,* Del.Supr., 496 A.2d 997, 1012 (1985), held that "the use of peremptory chal-

lenges to exclude prospective jurors solely on the basis of race violates a criminal defendant's right under *Del. Const* Art. I, § 7 to a trial by an impartial jury." In a later case, however, the Court noted that the procedures outlined in *Riley* are consistent with those outlined by the U.S. Supreme Court in *Batson. Robertson v. State*, 630 A.2d 1084, 1089 (1993). Since neither Outten nor Shelton can support a claim under *Batson*, they likewise cannot support a claim under *Robertson*.

## IV. OUTTEN'S APPEAL

 During the course of trial, Outten presented as a witness Lisa DeLude ("De-Lude"), who testified that Gibbons confessed to DeLude that she had killed Mannon. On cross-examination of DeLude, the State attacked her credibility by, *inter alia*, questioning why she had not come forward earlier. DeLude claimed that she had tried to call an attorney to discuss the matter, but the attorney did not return her call. On redirect, Outten's counsel attempted to introduce evidence that DeLude, in fact, had placed a call to Nelson's attorney. The trial court accepted the State's argument that D.R.E. 608(b) excludes such evidence and disallowed the introduction of the evidence. Outten contends that *Weber v. State*, Del. Supr., 457 A.2d 674 (1983), requires admission in circumstances such as these, where the jury does not have sufficient information to make a discriminating appraisal of the witness' possible motives for testifying in a certain manner.

D.R.E. 608(b) provides that:

*Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility*, other than the conviction of crime provided in Rule 609, *may not be proved by extrinsic evidence.*

D.R.E. 608(b) (emphasis added). D.R.E. 608(b) was designed, in part, to prevent time-

consuming "mini-trials" into the acts of a witness and was meant to cover situations like the one presented here. *See Weber*, 457 A.2d at 680. Outten's reliance on *Weber* to remove this case from D.R.E. 608(b)'s scope is misplaced. The evidence that this Court held should have been admitted in *Weber* concerned the witness' bias, not the credibility of the witness' alleged acts. D.R.E. 608(b) prohibits the introduction of the evidence related to DeLude's phone call. The trial court did not err in excluding the extrinsic evidence regarding DeLude's phone call.

## V. PROPORTIONALITY

 Finally, this Court must ensure that the imposition of the death sentence with regard to both Outten and Steven is proportionate in relation to similar cases.[7] Title 11 *Del.C.* § 4209(g)(2)(a) requires that there be some proportionality between the crime committed and the blameworthiness of the defendant.[8] 11 *Del.C.* § 4209(g)(2)a provides that the Supreme Court shall determine:

Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

In making this determination, this Court will scrutinize those First Degree Murder cases governed by the 1991 amendment to the death penalty statute which have continued to a penalty hearing and where the sentence has become final. In addition, the Court may consider those cases decided under the law in effect from 1985 to 1991 which the Court deems pertinent to the case before it. *Wright v. State*, Del.Supr., 633 A.2d 329, 342 (1993).

---

7. Neither Outten nor Steven argues that the jury's vote affects this Court's review.

8. In *Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1349 (1994), this Court stated "[W]e have concluded in the instant case, on significantly different facts, that there is no constitutional obstacle to the imposition of the death penalty either under the Delaware Constitution or under the United States Constitution." Outten's claim that his sentence violates the Eighth Amendment of

the United States Constitution, and his reliance on *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), therefore, is misplaced. *Enmund* invalidated as disproportionate a death sentence where the defendant neither participated in the killings nor intended for the victim to be killed. Here, the jury found that Outten actively participated in the murder. He swung a hammer at Mannon and crushed his skull with a washing machine top.

In view of this Court's decision in *Lawrie*, 643 A.2d at 1350, it is essential to distinguish between those cases governed by 11 *Del.C.* § 4209 as it existed before the 1991 amendment which became effective on November 4, 1991 in 68 Del.Laws Ch. 189 (the "pre–1991 cases"), and those cases governed by the current provisions of Section 4209 after November 4, 1991 (the "post–1991 cases"). In *Lawrie*, we held that the changes in the statutory scheme in 1991 created such a "significant dissimilarity between the pre–1991 cases and the post–1991 cases" that the former are merely "pertinent" but are "clearly distinguishable" because of the statutory change. 643 A.2d at 1350. The pre–1991 cases required a unanimous jury verdict to impose the death penalty. In the post–1991 cases, it is the trial judge who has the final responsibility for sentencing, and the jury's recommendation need not be unanimous. As a result, we held that the pre–1991 cases "are not 'similar cases arising under this section' [4209]. Thus, while pertinent, they are not dispositive...." *Id.* Further, we held in *Lawrie* that the particular pre–1991 cases being offered there as pertinent were not "significantly persuasive on the proportionality issue." *Id.*

Thus, the teaching of *Lawrie* is that this Court must scrutinize the post–1991 cases as the precise universe which is directly applicable to the statutorily-mandated proportionality analysis. While in a given situation a pre–1991 case may be pertinent, and thus may be considered, in the usual case it would not likely be "significantly persuasive." In the instant case, there is no pre–1991 case or post–1991 case which is pertinent to show that the death penalties here are disproportionate.[9]

Although a "definitive comparison of the universe of cases is almost impossible," this Court has relied upon the factual background of relevant cases to determine the proportionality of a sentence. *Pennell v. State*, Del.Supr., 604 A.2d 1368, 1376–77 (1992). "Most of the persons who have been sentenced to death in Delaware have committed

'an unprovoked, cold-blooded murder of a helpless person (or persons) ... [who lacked] the ability to defend themselves and solely for the purposes of pecuniary gain.'" *Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1349 (1994) (quoting *Riley*, 496 A.2d at 1027); *see also Wright v. State*, Del.Supr., 633 A.2d 329, 343 (1993).

Usually, deliberation has preceded the murder, though this finding is not necessary where there is intent to harm and the crime committed is heinous. *See Whalen v. State*, Del.Supr., 492 A.2d 552, 564 (1985) (although death penalty not imposed, death penalty is appropriate where defendant broke into home and brutally attacked, raped and strangled occupant). Here the murder was gruesome, unprovoked, vicious, brutal, unjustified and heinous. "An analysis of [defendant's] 'intentions, expectations, and actions' is appropriate to determine whether [defendant's] level of culpability is sufficient to justify the death penalty under the proportionality analysis." *Lawrie*, 643 A.2d at 1349. Based on Gibbons' testimony, scientific evidence and circumstantial evidence, the jury found that the two defendants had savagely beat a 64-year old man for a few inexpensive items. The defendants repeatedly struck Mannon with a hammer until the hammer handle split and then used a washing machine top to crush Mannon's skull. In our view this case is substantially similar, for proportionality review purposes, to other post–1991 death penalty cases where there were killings committed during the commission of a felony, and the pre–1991 death penalty cases are not inconsistent with this view. *See Lawrie*, 643 A.2d at 1350–51. The death sentences are warranted and are not disproportional.

## V. CONCLUSION

This Court has carefully reviewed the entire record and has considered and rejected all claims of error raised by both Outten and Steven. The death sentences are fair and are not disproportionate to the sentences imposed in similar cases arising under 11 *Del.C.* § 4209. Accordingly, the judgment of the Superior Court sentencing both Outten

---

9. In *Lawrie,* the appendix included all first degree murder cases which went to a penalty hearing since 1985, but carefully divided those cases between the pre–1991 cases and the post–1991 cases. The appendix to the instant decision includes as the appropriate universe only the post–1991 cases.

and Steven to death for the murder of Wilson Mannon is **AFFIRMED.** This matter is **REMANDED** to Superior Court for further proceedings in accordance with this opinion. This Court's Orders of May 13, 1993, staying the execution of Outten's and Steven's death sentences shall terminate upon the issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be hand-delivered forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

## APPENDIX

FIRST DEGREE MURDER CASES THAT WENT TO PENALTY HEARINGS UNDER 11 *DEL.C.* § 4209 AS AMENDED IN 1991 IN 68 DEL.LAWS CH. 189

The following list of cases is a complete restatement of all first degree murder cases decided under 11 *Del.C.* § 4209 as amended in 1991 by 68 Del.Laws Ch. 189, that have gone to a penalty hearing. It incorporates and supersedes the appendices in our decisions in *Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1352–56 (1994); *Ferguson v. State*, Del. Supr., 642 A.2d 772 (1994); *Gattis v. State*, Del.Supr., 637 A.2d 808 (1994); *Dawson v. State*, Del.Supr., 637 A.2d 57 (1994); *Sullivan v. State*, Del.Supr., 636 A.2d 931 (1994); *Wright v. State*, Del.Supr., 633 A.2d 329 (1993); *Red Dog v. State*, 616 A.2d 298 (1992); *Pennell v. State*, Del.Supr., Del. Supr., 604 A.2d 1368 (1992); *Dawson v. State*, Del.Supr., 581 A.2d 1078 (1990). Cases in which an appeal from the imposition of a sentence of death is pending are designated with a diamond (♦).

Cases Decided Under 11 *Del.C.* § 4209
As Amended in 1991 by 68 Del.Laws Ch. 189

| | |
|---|---|
| Case Name: | Meri–Ya C. Baker |
| Case No.: | IN90–12–1039, 1040 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Charles M. Cohen |
| Case No.: | IN90–02–0474 thru 0477 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | David F. Dawson |
| Case No.: | IK86–0024; IK87–01–0841; 0843, 0845 |
| County: | New Castle (venue changed) |
| Sentence: | Death |

| | |
|---|---|
| Case Name: | Byron S. Dickerson |
| Case No.: | IN90–12–1041, 1042 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Cornelius E. Ferguson |
| Case No.: | IN91–10–0576, 0578 thru 0581 |
| County: | New Castle |
| Sentence: | Death |

| | |
|---|---|
| Case Name: | Robert A. Gattis |
| Case No.: | IN90–05–1017 thru 1019, 1106, 1107 |
| County: | New Castle |
| Sentence: | Death |

Case Name: Arthur Govan
Case No.: 92–01–0166
County: New Castle
Sentence: Life Imprisonment

Case Name: Robert W. Jackson, III
Case No.: IN–92–04–1222 thru 1227; IN92–04–1348 and 1349
County: New Castle
Sentence: New penalty hearing scheduled

Case Name: David J. Lawrie
Case No.: IK92–08–0179 thru 0185; IK92–09–0148 and 0149
County: Kent
Sentence: Death

Case Name: Frank W. Moore, Jr.
Case No.: 92–09–0001, 0002, 1001, 2001, 3001
County: Sussex
Sentence: Life Imprisonment

Case Name: Jack F. Outten ♦
Case No.: IN92–01–1144 and 1145
County: New Castle
Sentence: Death—present proceeding

Case Name: James W. Perez
Case No.: IN93–02–1191 and 1197
County: New Castle
Sentence: Life Imprisonment

Case Name: James Allen Red Dog
Case No.: IN91–02–1495 to 1503
County: New Castle
Sentence: Death

Case Name: Jose Rodriguez
Case No.: IN93–020–1121
County: New Castle
Sentence: Life Imprisonment

Case Name: Reginald N. Sanders
Case No.: IK86–03–0898, 0899 and 0903
County: New Castle (venue changed)
Sentence: Life Imprisonment

Case Name: Nelson W. Shelton ♦
Case No.: IN92–01–1154 and 1155
County: New Castle
Sentence: Death—automatic appeal pending

Case Name: Steven W. Shelton ♦
Case No.: IN92–01–1149 and 1150
County: New Castle
Sentence: Death—present proceeding

Case Name: Donald J. Simmons
Case No.: IN92–01–0770 thru 0772; IN92–01–1140 and 1141
County: New Castle
Sentence: Life Imprisonment

| | |
|---|---|
| Case Name: | Willie G. Sullivan |
| Case No.: | IK–01–0192 thru 9196; IK92–02–0001; IK92–03–0022 |
| County: | Kent |
| Sentence: | Death |

| | |
|---|---|
| Case Name: | Charles H. Trowbridge |
| Case No.: | IK91–07–0175; IK91–09–0032 thru 0034 |
| County: | Kent |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | John E. Watson |
| Case No.: | IN91–09–0020 thru 0025 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Dwayne Weeks ◆ |
| Case No.: | 92–01–0167 |
| County: | New Castle |
| Sentence: | Death—automatic appeal pending |

| | |
|---|---|
| Case Name: | Roy R. Williamson |
| Case No.: | S93–05–0249 thru 0255 and S93–05–1249 and 2249 |
| County: | Sussex |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Jermaine M. Wright |
| Case No.: | IN91–04–1047 thru 1953 |
| County: | New Castle |
| Sentence: | New Penalty hearing Scheduled |